ELBA A.B.M. y OTROS, demandantes y recurridos, *v.* UNI-
VERSIDAD DE PUERTO RICO y CORPORACIÓN INSULAR
DE SEGUROS, demandados y recurrentes.

*Número:* RE-86-214 *Resuelto:* 23 de enero de 1990

*David Rivé Rivera*, de *Vargas & Rivé*, y *Edna Abruñas Rodrí-guez*, abogados de los recurrentes; *Graciany Miranda Mar-chand*, abogado de los recurridos.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

En *Estremera v. Inmobiliaria Rac, Inc.*, 109 D.P.R. 852, 856 (1980), adelantamos que existen ciertos tipos de actividades, tales como las llevadas a cabo por las escuelas, que por su naturaleza esencial vienen "obligad[as] a ofrecer un grado de protección y seguridad independiente del que puedan proveer las agencias de seguridad pública". El presente caso nos brinda la oportunidad de examinar la extensión de esta responsabilidad dentro del contexto de daños sufridos por una estudiante debido a la conducta criminal intencional (agresión sexual) perpetrada dentro de las facilidades de una institución educativa por una persona que no era ni estudiante ni empleado de la institución (en adelante tercero extraño).

I

El 29 de enero de 1986 el Tribunal Superior, Sala de San Juan, condenó a la Universidad de Puerto Rico (en adelante U.P.R.) y a su compañía de seguros, la Corporación Insular de Seguros (en adelante Insular), a pagar solidariamente a los demandantes Srta. Elba A.B.M.(1) y sus padres, el Sr. Antonio B.B. y la Sra. Cirila M.D., la suma de cuatrocientos cincuenta mil dólares ($450,000) por los daños que sufrieran como consecuencia de la violación sexual de la Srta. Elba A.B.M. en el Recinto de Río Piedras de la U.P.R.(2) Para la fecha del incidente ella era estudiante del Recinto. El individuo que la violó no tenía relación con la U.P.R.

El tribunal también encontró a Insular incursa en temeridad y le impuso el pago de ocho mil dólares ($8,000) en

---

(1) Para proteger la intimidad de la víctima de este desafortunado suceso, utilizaremos iniciales para identificar sus apellidos y el de sus familiares.

(2) El tribunal distribuyó los daños de la siguiente manera: a la víctima, la codemandante Elba A.B.M., trescientos cincuenta mil dólares ($350,000) y a sus padres, los codemandantes B.B. y M.D., cincuenta mil dólares ($50,000) a cada uno.

honorarios de abogado y el pago de intereses al tipo legal computados sobre la totalidad de la sentencia y hasta que dicha compañía aseguradora pague o consigne aquella parte de la sentencia que le corresponda satisfacer bajo la póliza.

No conformes, los demandados recurrieron ante este Tribunal planteando las interrogantes siguientes:

SI LA U.P.R. RESPONDE POR LOS ATAQUES CRIMINALES QUE PUEDAN SUFRIR SUS ESTUDIANTES U OTRAS PERSONAS QUE ESTEN DENTRO DE SUS RECINTOS.

SI LA PRUEBA JUSTIFICA LAS CUANTIAS CONCEDIDAS.

ASUMIENDO QUE LA U.P.R. ES RESPONSABLE, SI ESTA Y SU COMPAÑIA DE SEGUROS INCURRIERON EN TEMERIDAD.

## II

*Los hechos*

A. *Negligencia*. De acuerdo con la prueba creída por el tribunal, los hechos que dieron lugar a la reclamación ocurrieron como procedemos a relatar. La codemandante Elba A.B.M., para la fecha del incidente —el 6 de octubre de 1980— era estudiante nocturna de un programa especial del Centro de Desarrollo Gerencial del Recinto de Río Piedras.

La noche de los hechos, la profesora de uno de los cursos despachó la clase como a las 7:45 de la noche, unos minutos antes de la hora acostumbrada. Ante ello, la demandante llamó a su casa desde un teléfono público en el Edificio Juan José Osuna para que la vinieran a recoger y se sentó a esperar en el vestíbulo. Este edificio está localizado en el área que agrupa los edificios de Ciencias Sociales Graduado, Ciencias Sociales, Comercio y Pedagogía, área que se conoce comúnmente en la U.P.R. como la de los "cuatro grandes".

Al poco tiempo de estar esperando, se sentó a su lado un individuo joven. Éste aparentaba estar nervioso. Sorpresiva-

mente, el individuo sacó un cuchillo(3) puntiagudo y afilado que colocó en el cuello de la joven. Sujetándola por un brazo, y mientras la amenazaba con el cuchillo, la obligó a levantarse del banco. Atravesaron primeramente el vestíbulo del edificio y luego cruzaron la calle para adentrarse en un área oscura frente al Edificio Juan José Osuna. En ese lugar no había alumbrado y la vegetación, de aproximadamente tres (3) pies de alto, era tupida, cerrada y espesa. Cerca del lugar había árboles frondosos con lianas y bejucos que hacían el área más densa aún. Durante todo el trayecto no se toparon con persona alguna.

Al llegar al lado de un transformador eléctrico, el agresor ordenó a la joven codemandante Elba A.B.M. detenerse y quitarse la correa y el pantalón que llevaba puesto. Ante el estado de confusión de la joven, el agresor terminó por quitarle él mismo la ropa de la cintura hacia abajo, incluso sus prendas íntimas. Acto seguido, éste procedió a violar y abusar sexualmente de su víctima en forma oral, genital y anal.

Durante su testimonio en corte, la víctima relató que luego de que el agresor ya la había violado, se levantó y le exigió entonces que colocara su genital en la boca de ella. Éste le iba indicando, mientras seguía amenazándola con el cuchillo, las cosas que quería que ella le hiciera. Al respecto la codemandante Elba A.B.M. expresó: "[e]n una ocasión cuando me caí, me agarró por el cuello y me dijo que no gritara y que hiciera lo que él decía. Me ordenó que me pusiera de espaldas y se me tiró encima y me introdujo el pene por el ano; luego me introdujo el dedo por el ano y después lo hizo por la vagina. Estaba convencida de que no saldría con vida de allí. [É]l me indicó que me pusiera de espaldas y me intro-

---

(3) Un examen del cuchillo sometido en evidencia demuestra que éste estaba extremadamente afilado y terminaba en una fina y aguda punta parecida a la de un punzón.

dujo otra vez el pene por el ano. Entonces, comencé a rezar . . .". Apéndice, pág. 28.

Fue precisamente mientras era sodomizada nuevamente que se percató de que el cuchillo del asaltante se hallaba en un lugar a su alcance. Haciendo uso de un pie fue acercando el cuchillo hasta que pudo tomarlo con su mano derecha. Mediante un movimiento rápido y sobre su hombro izquierdo logró alcanzar y herir de muerte a su agresor. En estos momentos comenzó a gritar y a pedir ayuda. El individuo, aunque herido, forcejeó con la joven en un intento final de quitarle el cuchillo. Durante este forcejeo la codemandante Elba A.B.M. cayó al suelo con el cuchillo en la mano, enterrándolo en la tierra mientras el agresor intentaba quitárselo. No obstante, asustado por los gritos de su víctima, él optó por salir corriendo hasta desplomarse más adelante. Por su parte, la codemandante, desnuda de la cintura hacia abajo, herida, sangrando y con el cuchillo aún en la mano, salió de los arbustos gritando y pidiendo ayuda. Ante esta trágica situación, varios estudiantes acudieron a socorrerla. Una estudiante le ayudó a ponerse la ropa, mientras otro fue en busca de la guardia universitaria.

Aunque se suponía que la noche de la agresión hubiese un guardia universitario en la valla de seguridad al lado del Edificio Juan José Osuna y otro dando ronda preventiva en motora a través de los cuatro (4) edificios que ocupan ese lugar, esa noche no había guardias universitarios cerca del lugar. Los dos (2) guardias asignados al turno de 8:00 P.M. a 12:00 de la medianoche habían informado que estarían ausentes de su trabajo. Éstos no fueron sustituidos. No existía plan o procedimiento alguno para ello. La guardia universitaria no había establecido un sistema de prioridades para atender la seguridad de los estudiantes.

Los primeros guardias universitarios se personaron al lugar diez (10) minutos después de que fuera el estudiante en busca de ayuda. Llegaron conduciendo una ambulancia. La

codemandante Elba A.B.M. y la Sra. Margarita Aguida, estudiante que momentos antes la había ayudado a vestir, subieron a la ambulancia. Luego de haber recorrido un corto trecho, uno de los guardias universitarios les informó que tenían que detenerse a recoger otra persona que se estaba desangrando dentro del Recinto. Esta persona resultó ser el agresor. A pesar de la desesperada oposición de la víctima de tener que compartir la ambulancia con su agresor, se le informó que no había otra ambulancia disponible, que el herido tenía preferencia y que su única opción era acompañarlos o bajarse de la ambulancia. La codemandante Elba A.B.M. optó por bajarse.

Gracias a la generosidad de otro estudiante, pudo por fin trasladarse en el vehículo de éste al Hospital Guadalupe donde, a pesar de estar sangrando, tanto anal y vaginalmente como por otras partes de su cuerpo, le indicaron que no la podían atender porque su caso debía ser referido al Centro de Víctimas de Violación. Ante ese hecho, los estudiantes la llevaron al Centro Médico donde se le atendió y se le sometió a un examen pélvico. El informe médico confirmó todos los aspectos principales del ataque y las condiciones físicas en que se encontraba la joven Elba A.B.M. después de la agresión.

B. *Daños*. Como resultado de la experiencia vivida la noche del 6 de octubre de 1980, la codemandante abandonó sus estudios en la universidad. Aunque más tarde intentó reanudarlos, no pudo lograrlo debido al estado emocional en que quedó. Según sus propias palabras, temía quedarse sola en cualquier lugar, por lo que recurría a sus hermanos para que la acompañaran cuando salía de la casa. Apenas socializaba fuera de su hogar ante el temor constante de que se repitiese la experiencia. Aunque ha continuado trabajando, tiene mucha dificultad para concentrarse. La relación con su padre y sus hermanos, desde entonces, ha cambiado; ahora es inadecuada. Evita todo contacto social con miembros del sexo

opuesto. Rechaza la idea de llegar a constituir una familia y tener hijos. Le aterra la posibilidad de tener una niña porque entiende que la haría desgraciada fiscalizándola continuamente.

Aunque la codemandante Elba A.B.M. recibió tratamiento siquiátrico y orientación en el Centro de Ayuda a Víctimas de Violación, su condición no ha mejorado. De acuerdo con la prueba del perito Dr. José C. Villanueva, estipulada por las partes, "[e]s obvio que esta joven ha estado y está sumamente afectada, no ha podido reintegrarse a su vida anterior al incidente y ha desarrollado una negatividad y unas ideas erróneas hacia la figura masculina. Los miedos, desconfianza y empobrecimiento de las relaciones familiares se han mantenido, ésto último debido a que inconscientemente ella culpabiliza (sic) a la familia. Es imposible predecir el futuro, ella necesita psicoterapia intensiva pero hasta ahora ella no se ha decidido a aceptarla. Mi opinión es que le (sic) será muy difícil el que ella vuelva a funcionar como antes y hay el peligro que no pueda establecer unas relaciones positivas y permanentes con miembros del sexo opuesto". Apéndice, pág. 33. Agregó "que a partir del incidente, hubo un cambio radical en su conducta. Se sentía deprimida todo el tiempo, no salía, estaba irritada con su familia sin motivo para ello; no sentía alegría y, en ocasiones, no tenía deseos de vivir. Las ideas de menosvalía y poca estima eran frecuentes. Durante estos años fue muy difícil el reajuste; tuvo que cambiar de trabajo y las pesadillas no desaparecieron. Desarrolló un temor a los muchachos y, aunque trataba de salir con ellos, experimentaba ansiedad y pánico. Se abstuvo de socializar con sus antiguas amistades, pues siempre le quedaba el temor sobre lo que podían pensar de ella . . . . Empezó a estudiar de nuevo pero no se concentraba bien y siempre asociaba el estudio con la experiencia. Esto le producía miedo. Han persistido las pesadillas de violencia y de la experiencia sufrida". Apéndice, pág. 32.

El testimonio de los padres, codemandantes en esta acción, fue estipulado por las partes. De sus declaraciones escritas surge que la noche de los hechos, al llegar al hospital, el padre sufrió un desmayo al enfrentarse con su hija empapada en sangre. Durante los cinco (5) meses siguientes la madre tuvo que dormir con la codemandante, afectándose su vida marital. El padre, por su parte, observó cambios de conducta en su hija respecto a él y al resto de la familia. Se creó un ambiente de fricción y desasosiego. La relación paterno-filial se deterioró a tal grado que el padre evita hasta dirigirle la palabra a su hija. La tirantez ha afectado la vida en el hogar y las relaciones familiares antes existentes.

En relación con la negligencia de la U.P.R., el tribunal de instancia encontró, además, que más de un (1) año antes de ocurrir el infortunado incidente un grupo de estudiantes de la Escuela Graduada de Trabajo Social había efectuado un estudio sobre las agresiones sexuales que ocurrían en el Recinto de Río Piedras. Con el propósito de informar sus hallazgos y requerir que se tomaran medidas para prevenir agresiones en áreas identificadas como de mayor riesgo, solicitaron una entrevista con el entonces Rector de la Universidad, arquitecto Miró Montilla. Éste delegó en el Decano de Administración, a esa fecha señor Girona, para que recibiera el estudio y luego discutiera las sugerencias con el Rector. La primera reunión se celebró el 20 de noviembre de 1979, aproximadamente un (1) año antes de los hechos. Estuvieron presentes tanto la profesora a cargo del estudio como los estudiantes que lo efectuaron. Durante esta reunión el grupo informó al Decano Girona que, según su estudio, existían sectores del recinto universitario que no eran seguros. También sugirieron varias alternativas para prevenir las agresiones sexuales. Recomendaron aumentar la vigilancia en ciertas áreas; mejorar el alumbrado en las calles y áreas dentro del Recinto; establecer un centro de servicios para las víctimas de abusos sexuales; desarrollar una campaña de

orientación a la comunidad universitaria; crear conciencia entre los administradores sobre la necesidad de atender el problema, y adiestrar al personal médico y de vigilancia para ayudar a las víctimas de abusos sexuales.

Con la finalidad de dar seguimiento a la primera reunión, se celebró otra el 27 de noviembre de 1979. En ésta estuvieron presentes la Decana Auxiliar de Estudiantes y el entonces Director de la Guardia Universitaria, señor Echevarría. La discusión giró principalmente en torno a aquellas áreas que resultaban propensas a agresiones sexuales y a la posibilidad de adiestrar a la guardia universitaria sobre ello.

Como resultado de esta reunión, se acordó que uno de los participantes del grupo de estudio recibiría un mapa del Recinto de Río Piedras en el cual delimitaría las áreas de mayor incidencia de este tipo de agresiones. La estudiante Emma Amaró marcó en el mapa, con un sello blanco y negro, las áreas de más alto riesgo. Se identificaron siete (7) áreas, correspondiendo una de ellas precisamente a la llamada "los cuatro grandes" donde se encuentra el edificio e inmediaciones donde ocurrieron los hechos. Al identificar estas áreas se tomó en consideración la información que aparecía en el Libro de Novedades sobre incidentes de abuso sexual.

El 25 de marzo de 1980, la Sra. Mary Ann Maldonado, Directora del Centro de Ayuda a Víctimas de Violación, se reunió con el Rector Miró Montilla con el propósito de discutir los actos delictivos de índole sexual en el Recinto. La señora Maldonado le recalcó el alto riesgo de las áreas señaladas en el estudio. Expresó su preocupación de que las estudiantes fueran víctimas de agresiones sexuales debido a las deficientes medidas de seguridad y de vigilancia del lugar. Recomendó e hizo énfasis en la necesidad de podar los arbustos y sustituir los focos fundidos. Sugirió, además, el establecimiento de un centro de ayuda a víctimas de violación dentro del Recinto para ofrecer orientación, servicios médicos y sicológicos. De acuerdo con la señora Maldonado, el

Rector Miró Montilla le informó que no podían implantar las medidas sugeridas debido a la falta de los fondos necesarios para mejorar el alumbrado y dar mantenimiento al Recinto. En cuanto al programa de orientación, le indicó que el mismo podía proyectar una imagen negativa del Recinto y asustar a los padres de los estudiantes.

El tribunal también determinó que la guardia universitaria tenía un Libro de Novedades donde anotaban las observaciones del guardia de turno sobre anomalías en la planta física, ausencia de los guardias y su justificación, querellas de estudiantes o profesores sobre actos delictivos, y asuntos misceláneos que afectaban el orden institucional del Recinto.

El señor Sagardía, Director de la Guardia Universitaria, declaró además que ésta no recibía adiestramiento especial alguno. Lo único que se les enseñaba era a dar multas a los vehículos mal estacionados y a usar los radio transmisores portátiles (*walkie-talkies*). No se había establecido un sistema de prioridades en términos de seguridad ni un procedimiento para sustituir los guardias universitarios que faltasen. Ellos no investigaban los actos delictivos que ocurrían en el Recinto; solamente los registraban en el Libro de Novedades. La investigación la hacía la Policía estatal si el perjudicado se querellaba o si era de suficiente magnitud para que la guardia universitaria lo informara. En este Libro de Novedades aparece la violación sufrida por la codemandante Elba A.B.M. registrada como un intento de violación.

Descritos los hechos que dieron lugar a la reclamación solicitada, veamos los principios generales sobre la determinación de negligencia.

III

*Principios generales de la responsabilidad a base del deber de actuar*

■ Conocido es el principio de que la responsabilidad civil derivada de actos u omisiones culposas o negligentes se rige por lo dispuesto en el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. *Gierbolini v. Employers Fire Ins. Co.*, 104 D.P.R. 853 (1976); *Valle v. Amer. Inter. Ins. Co.*, 108 D.P.R. 692 (1979). Para que exista responsabilidad bajo este artículo es necesario que ocurra una acción u omisión, un daño y la correspondiente relación causal entre el daño y la conducta culposa o negligente. *Pérez Escolar v. Collado*, 90 D.P.R. 806 (1964); *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305 (1970).

■ En el caso de las omisiones, la ocurrencia de éstas sólo dan lugar a una causa de acción en los casos en que exista un deber de actuar. J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1983, pág. 80. Para que ocurra un acto negligente como resultado de una omisión tiene que existir un deber de cuidado impuesto o reconocido por ley, y que ocurra el quebrantamiento de ese deber. H.M. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 183.

Cierto tipo de empresas, tales como las escuelas, los hospitales y los hoteles, tienen el deber de "mantener unas medidas [de razonable] protección de sus huéspedes, pacientes y estudiantes que no tienen que suplir otros contratantes y empresarios, cuya actividad no absorbe necesariamente, en el ámbito de ejecución del contrato, la protección de partes y terceros contra ataques criminales. El Código Civil tiene provista la norma [civil] de responsabilidad relativa, conjugada con la clase de actividad, en su Art. 1057 (31 L.P.R.A.

sec. 3021) que ordena: '[L]a culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar . . .'". *Estremera v. Inmobiliaria Rac, Inc.*, supra, pág. 856. Esta protección es independiente de la que puedan ofrecer las agencias de seguridad pública.

 Un elemento esencial de la responsabilidad por culpa o negligencia es el factor de la previsibilidad y el riesgo involucrado en el caso específico. El grado de previsibilidad requerido en cada caso en particular depende del estándar de conducta aplicable. *Baralt et al. v. ELA*, 83 D.P.R. 277 (1961); *Rivera Matos v. Amador*, 86 D.P.R. 856 (1962); *Vda. de Andino v. A.F.F.*, 93 D.P.R. 170 (1966). El deber de cuidado incluye tanto la obligación de anticipar como la de evitar la ocurrencia de daños cuya probabilidad es razonablemente previsible. "Pero la regla de anticipar el riesgo no se limita a que el riesgo preciso o las consecuencias exactas arrostradas debieron ser previstas. Lo esencial es que se tenga el deber de prever en forma general consecuencias de determinada clase." *Ginés Meléndez v. Autoridad de Acueductos*, 86 D.P.R. 518, 524 (1962).

 Por otro lado, para determinar lo que constituye un resultado razonablemente previsible debemos acudir a la figura del hombre prudente y razonable según definida ésta en nuestra jurisprudencia. *Ortiz v. Levitt & Sons*, 101 D.P.R. 290 (1973). Tomando como fundamento esta figura hemos resuelto que "[e]l deber de previsión no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad . . . sino a aquel que . . . llevaría a una persona prudente a anticiparlo". *Hernández v. La Capital*, 81 D.P.R. 1031, 1038 (1960).

■ Ahora bien, para que exista responsabilidad por un daño causado por la negligencia de otro es necesario que entre ésta y aquél exista una relación causal, y para que exista esta relación causal es necesario que el daño ocasionado haya sido previsible y evitable de haberse realizado a tiempo la acción omitida. Puig Brutau, *op. cit.*, pág. 97. La dificultad estriba en poder precisar "cuándo se da la relación de causalidad y cuáles son sus límites; cuándo deba estimarse que el hecho productor del daño es causa jurídica que según su naturaleza general aparezca como adecuada para engendrar ese daño" (*Estremera v. Inmobiliaria Rac, Inc.*, supra, pág. 859), especialmente cuando se trata de un daño que es el resultado de un acto delictivo de un tercero.

■ El principio aplicable es el de la causalidad adecuada que postula que la ocurrencia del daño en cuestión era previsible dentro del curso normal de los acontecimientos. En otras palabras, causa es "la condición que ordinariamente produce el daño, según la experiencia general". *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700, 704, (1982); J. Santos Briz, *Derechos de Daños*, Madrid, Ed. Rev. Der. Privado, 1963, pág. 215. Este nexo causal puede ser roto por la ocurrencia de un acto extraño al primero. "[L]a relación causal puede interrumpirse (*causa interveniens*) por la irrupción de un tercero interviniente, pero en tal caso la inmisión de su acto debe ser consciente, intencional o antijurídica." *Valle v. Amer. Inter. Ins. Co.*, supra, pág. 698.

■ De todo lo anteriormente expuesto se puede colegir que la difícil determinación de cuándo existe un nexo causal entre el daño producido por un acto delictivo de un tercero y la omisión de cumplir con la obligación de tomar precauciones, medidas de seguridad y protección, no puede "resolverse nunca de una manera plenamente satisfactoria me-

diante reglas abstractas, sino que en los casos de duda ha de resolverse por el juez según su libre convicción, ponderando todas las circunstancias". J. Castán Tobeñas, *Derecho Civil español, común y foral*, 10ma ed., Madrid, Ed. Reus, 1967, T. 3, pág. 195.

Conforme a las normas antes expresadas, debemos ahora determinar qué factores propician que se imponga responsabilidad a las instituciones educativas.

## IV

*Responsabilidad de las instituciones educativas a base de su deber de cuidado*

■ Las instituciones educativas, por su naturaleza, atraen una gran concentración de gente joven cuya característica principal usualmente es de una gran confianza en sí mismos y en sus semejantes, lo que engendra a su vez una despreocupación por su seguridad personal. Un por ciento cada vez mayor de estos jóvenes son mujeres. Por otra parte, el interés primordial de los educadores y administradores se centra en la educación, no en la protección o medidas de seguridad contra actos delictivos. El fácil acceso a estas instituciones, unido a estas circunstancias, crea una tentación u oportunidad especial que propicia la conducta criminal, especialmente de los delitos de agresión sexual contra las jóvenes estudiantes. Esto hace que sobre estas instituciones recaiga, pues, una responsabilidad especial de velar por la protección y seguridad de estas estudiantes. La situación creada en la comunidad estudiantil así lo exige.[4] *Estremera v. Inmobiliaria Rac, Inc.*, supra.

---

[4] A tales efectos se ha dicho que:

"University campuses serve as natural preying grounds for the rapist. Large concentrations of single, young women, easy access to campus grounds; and a variety of potential crime scenes (dormitories, empty classrooms, large open areas, etc.), make college campuses vulnerable to this type of crime. While

312

■ Si a todo lo anterior le añadimos el aumento en la ocurrencia de violaciones dentro de los recintos de universidades y colegios habido en los últimos años, el deber de tomar medidas cautelares para la seguridad de las jóvenes estudiantes contra ataques de naturaleza sexual resulta evi-

campus police report that the modus operandi of campus rapists differ, their conceptions of the campus rapists are similar.

"According to university police, the majority of campus rapes are committed by nonstudents from surrounding metropolitan areas." *Rape and its Victims: A Report for Citizens*, Law Enforcement Assistance Administration, U.S. Department of Justice, noviembre 1975, págs. 209–210.

Sobre el desarrollo de esta tendencia en Estados Unidos se ha dicho:

"Universities during the late 1960s and early 1970s were mainly troubled by the alarming trend of social and political unrest that, although of great concern to administrators, did not seriously threaten the safety of the campus population. As campus unrest waned it appeared to be replaced by a new problem—namely, increased crime in the form of thefts, assaults, robberies, rapes, and the selling of drugs and narcotics.

"College and university campuses became prime targets for outside criminals who realized that a campus population was made up of mostly young people who had little concern for security or crime and administrators whose main interest was education, not protection or enforcing the law. Therefore, many undesirables invaded college campuses to steal, rob, deal in drugs, and commit sexual acts including rape.

"The university environment itself contributed to increased crime because during the past twenty years it has changed from a somewhat cloistered existence removed from the outside community to the unrestricted open campus of today.

. . . . . . . . .

"In speaking about crime statistics we also must recognize that many crimes are never reported. The percentage of unreported crimes is especially high on campus because many young people seem to be reluctant to report anything to the police. Students say, 'Why report it? Nothing will be done.' Too often they are correct, because their campus security departments have no effective reporting system and little investigative ability.

. . . . . . .

"Most colleges and universities have an understanding with their local police departments that officers do not come on campus unless requested to do so. Where does this leave the students and employees when there is a weak, low-level campus security operation? They are being treated like second-class citizens as far as security is concerned. The institution is virtually issuing an open invitation to thieves, rapists, and other criminals to engage in their acts, with the odds much lower that they will be caught than in the outside community." J. Powell, *Campus Security and Law Enforcement*, Boston, Butterworth Publishers Inc., 1981, págs. 9–14.

dente. L. Territo, *Campus Rape, Determining Liability*, 19 (Núm. 9) Trial 100 (septiembre 1983); Nota, *Liability of University, College, or Other School for Failure to Protect Student from Crime*, 1 A.L.R. 4th 1099–1104, y Suplemento, págs. 131–134. Véanse, entre otros, los casos de *Isaacson v. Husson College*, 297 A.2d 98 (Me. 1972); *McLeod v. Grant County School Dist. No. 128*, 255 P.2d 360 (Wash. 1953). Si la institución educativa no toma las medidas de seguridad necesarias para proteger a las estudiantes y así minimizar las circunstancias que propician y brindan la oportunidad a terceros extraños para realizar estos ataques sexuales y causar daño, son negligentes por haber fallado en su deber para con la víctima: la estudiante. N. Hauserman y P. Lansing, *Rape on Campus: Post Secondary Institutions as Third Party Defendants*, 8 J.C. & U.L. 182, 190 (1982).

▮▮▮▮ En este tipo de casos el peso de la prueba es el mismo que en cualquier otro en que se alegue la ocurrencia de daños y perjuicios como resultado de negligencia. La parte demandante puede probar con evidencia, directa o circunstancial, la omisión de la institución educativa de ofrecer una adecuada protección y seguridad a sus estudiantes. La ocurrencia anterior en el Recinto de actos delictivos similares, el hecho de que las autoridades universitarias conocían o debieron conocer de los mismos, la falta de un sistema adecuado de investigación y seguimiento a incidentes de esta naturaleza, la falta de divulgación de información sobre los peligros, la falta de un plan y facilidades para ayudar a las víctimas, el no corregir condiciones que propician la agresión sexual, la ausencia total de un sistema de prioridades para atender la seguridad de los estudiantes, y la falta de personal adecuadamente entrenado para velar por la protección y seguridad son, entre otros, factores que demuestran incumpli-

miento con el deber de ofrecer una protección adecuada.(5) Después de todo, la negligencia en que incurre la institución educativa depende de que ésta haya omitido desplegar aquella diligencia necesaria para ofrecer una adecuada protección y seguridad a sus estudiantes, tomando en consideración "las circunstancias de las personas, del tiempo y del lugar". Art. 1057 del Código Civil, *supra*.(6)

En resumen, es importante recalcar que la responsabilidad de las instituciones educativas universitarias por los daños intencionales perpetrados contra sus estudiantes por terceros extraños a la misma no es absoluta, a pesar de que sobre éstas recae una especial responsabilidad para con sus estudiantes; vienen obligadas "a mantener unas medidas razonables de seguridad en protección de [éstos]". *Estremera v. Inmobiliaria Rac, Inc.*, supra, pág. 856. Es el incumplimiento con este deber, unido al hecho de que el daño sea previsible y su incumplimiento la causa adecuada, lo que responsabiliza a la institución. El grado de seguridad que viene obligada a ofrecer una institución educativa depende de la naturaleza de la institución, de su localización y de la manera en que funciona y ofrece sus servicios.

Establecido lo anterior, pasemos a considerar si a base de la prueba presentada y de los criterios antes expuestos la U.P.R. incumplió con su deber de ofrecer adecuada protección a sus estudiantes, si el daño ocasionado a los deman-

---

(5) En *Mullins v. Pine Manor College*, 449 N.E.2d 331, 338 (Mass. 1983), se dijo que "'whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of plaintiff'". Véase, también, S. Loggans, *Rape as an Intentional Tort*, 21 Trial 45–46 (octubre 1985).

(6) En Estados Unidos se ha llegado a resultados similares. Véanse, entre otros: *Peterson v. San Francisco Comm. College Dist.*, 685 P.2d 1193 (Cal. 1984); *Relyea v. State*, 385 So. 2d 1378, 1383 (1980); *Stockwell v. Board of Trustees, Etc.*, 148 P.2d 405 (1944).

dantes era previsible y si el incumplimiento fue la causa adecuada del mismo.

## V

*Aplicación de las normas de derecho a los hechos específicos del caso*

La U.P.R. es la única institución educativa pública para estudios postsecundarios a nivel universitario en la isla. Está compuesta por varios recintos entre los cuales se encuentra el de Río Piedras, el principal y más grande de ellos. Este Recinto, localizado en una zona de alta incidencia criminal,[7] tiene una extensión de terreno que cubre un área de doscientas setenta y ocho (278) cuerdas. Por razón de su tamaño, tiene varios accesos para automóviles y peatones a través de las Avenidas Ponce de León y Barbosa, y de la Calle Gándara. Su configuración física está compuesta por numerosas áreas verdes y edificios. Específicamente, para 1980 había ciento nueve (109) edificios en el Recinto.[8]

A la fecha de los hechos había matriculados en el Recinto de Río Piedras veintitrés mil trescientos setenta y tres (23,373) estudiantes. De este total, ocho mil setecientos trece (8,713) eran varones y catorce mil seiscientos sesenta (14,660) eran mujeres. De éstos, había dos mil quinientos setenta y ocho (2,578) estudiantes nocturnos, de los cuales mil ciento treinta y ocho (1,138) eran varones y mil cuatrocientos cuarenta (1,440) eran mujeres.[9] Como se puede apreciar, la proporción de mujeres estudiantes (sesenta y dos punto

---

[7] Según refleja el Informe Anual de Criminalidad de la Policía de Puerto Rico correspondiente a 1980.

[8] De acuerdo con la Oficina de Programación y Desarrollo Físico de la Universidad de Puerto Rico, Recinto de Río Piedras.

[9] Datos de acuerdo con la Oficina de Planificación y Desarrollo de la Universidad de Puerto Rico, Recinto de Río Piedras.

siete por ciento (62.7%)) era significativamente más alta que la de varones (treinta y siete punto tres por ciento (37.3%)).

Estos factores de localización en un área de alta incidencia criminal, espacios amplios y abiertos, múltiples y fáciles accesos y una alta concentración de estudiantes, específicamente de mujeres en su mayoría jóvenes, crearon un ambiente propicio para la comisión de actos delictivos de la naturaleza del que sufrió la codemandante Elba A.B.M. Véase *Rape and its Victims: A Report for Citizens*, Law Enforcement Assistance Administration, U.S. Department of Justice, noviembre 1975, págs. 209–210.

No cabe duda que la prueba creída por el tribunal demostró que *las autoridades universitarias conocían no sólo sobre la ocurrencia de hechos delictivos anteriores de naturaleza similar a los sufridos por la demandante Elba A.B.M. —agresiones sexuales— sino también cuáles eran aquellas áreas que por sus circunstancias particulares se podían considerar de alto riesgo. El lugar de los hechos fue específicamente identificado con un sello blanco y negro en el mapa del Recinto en señal de su peligrosidad. Esta información se discutió, ampliamente y en más de una ocasión, con distintos funcionarios de la U.P.R., incluso con el entonces Rector Miró Montilla. Ya desde 1979 se habían traído a la atención de las autoridades universitarias estos problemas de seguridad.* En resumen, el riesgo de violación o agresión sexual en el área de los "cuatro grandes" era uno que la U.P.R. conocía o debió conocer, por lo que la acción del intruso fue previsible.

La prueba también estableció la existencia de arbustos sin podar, una frondosa y espesa vegetación y edificios solitarios, todo ello acompañado de poca iluminación en el área de los hechos. Ésto, unido a la escasez de vigilancia, a la ausencia de un plan coordinado que estableciera prioridades para lidiar con la seguridad en el Recinto y al hecho de que la guardia universitaria no recibía adiestramiento especial

para prevenir e investigar este tipo de delito, indudablemente facilitó la comisión del mismo. *Todo lo anterior era conocido por la U.P.R., mas nada se hizo por remediar la situación. La U.P.R. no tomó las medidas necesarias para corregir una situación peligrosa conocida por ella y creada por la localización de la institución y la naturaleza de la comunidad estudiantil.* A lo anterior debemos añadir que existe una política interna en la U.P.R. de no permitir la entrada de la Policía de Puerto Rico al Recinto, excepto en ocasiones extraordinarias.(¹⁰) *Todas estas circunstancias hicieron previsible los hechos de agresión sexual que ocurrieron.*

█ La U.P.R., consciente de todas las circunstancias antes reseñadas, arguye que por el tamaño del Recinto no se le puede exigir responsabilidad en cuanto a sus estudiantes y que la seguridad pública compete a la Policía de Puerto Rico. No le asiste la razón. Como institución educativa venía obligada "a ofrecer [a sus estudiantes] un grado de protección y seguridad independiente del que puedan proveer las agencias de seguridad pública". *Estremera v. Inmobiliaria Rac, Inc.,* supra, pág. 856. De aceptar la posición de la U.P.R., el resultado sería que los estudiantes no contarían, en vista de la política de exclusión de las fuerzas de seguridad estatales adoptada, ni con la protección de la Policía estatal ni con un sistema razonable de seguridad provisto por las autoridades universitarias. Bajo esta premisa, los estudiantes del Recinto se convertirían en presas fáciles de todo aquel delincuente que penetrase dentro del Recinto; su total desamparo resulta inaceptable. Ante la situación descrita, no es demasiado oneroso el requerir que, dentro del área central del Recinto, se hubiese implantado un mejor sistema de seguri-

---

(¹⁰) Certificación Núm. 32 del Consejo de Educación Superior de 6 de octubre de 1967.

dad que el que imperaba al momento de los hechos. Las autoridades universitarias no podían abstraerse de esta realidad.

Además, la U.P.R. no poseía un sistema efectivo de recopilación y evaluación de información que le permitiese percatarse adecuadamente de los riesgos y necesidades de su estudiantado. Meramente se limitaba a hacer una anotación en el Libro de Novedades sin ningún trámite ulterior. Carecía de personal entrenado para el manejo de casos como el de la codemandante Elba A.B.M. y de un sistema para instruir a los estudiantes sobre los posibles riesgos en el Recinto y la forma de evitarlos. Tampoco existía un plan para establecer prioridades de forma que las áreas de mayor peligro recibiesen mejor vigilancia, particularmente durante la noche, a pesar de que se habían promocionado cursos nocturnos como a los que asistía la codemandante Elba A.B.M. Además, la U.P.R. había permitido que en el Recinto hubiese vegetación espesa producida por árboles y arbustos sin podar y falta de iluminación adecuada, todo ello agravando la peligrosidad del Recinto. A pesar de conocer todas estas condiciones, la U.P.R. no realizó las gestiones necesarias para corregir la flagrante y crasa ausencia de un sistema de protección y seguridad adecuado para sus estudiantes. Adviértase que, según surge de los hechos, la violación de la codemandante Elba A.B.M. se extendió durante un lapso relativamente largo, y cuando ésta finalmente se libera de su agresor y clama por ayuda, no aparece ningún miembro de la guardia universitaria a socorrerla hasta tanto no se fue en busca de éstos. De haber tomado medidas de seguridad razonables, a tono con las necesidades y realidades del Recinto, se hubieran minimizado los riesgos y hasta, quizás, evitado el desafortunado suceso que hoy nos ocupa.

Las recurrentes en su alegato plantean, además, que hubo error en la apreciación de la prueba. Señalan con gran ahínco que en las determinaciones de hecho del tribunal de instancia no se hizo referencia a que se probó que el lugar de

donde fue secuestrada la joven demandante estaba plenamente iluminado. Además, alegan que el estudio a que alude la sentencia fue objetado oportunamente y que dicha objeción la sostuvo el tribunal. Por último, cuestionan la determinación de que cerca del área de los hechos no había esa noche un guardia de la U.P.R.

Examinada cuidadosamente la transcripción de la prueba, así como toda la prueba documental ofrecida y admitida ante el tribunal de instancia, encontramos que tales errores no se cometieron. Reiteradamente hemos resuelto que, en ausencia de una demostración de error manifiesto, prejuicio, parcialidad o pasión, no existe fundamento en derecho para intervenir con la apreciación de la prueba hecha por el tribunal de instancia. *La Costa Sampedro v. La Costa Bolívar*, 112 D.P.R. 9 (1982); *Epstein v. F. & F. Mortgage Corp.*, 106 D.P.R. 212 (1977); *Soc. de Gananciales v. Soc. de Gananciales*, 104 D.P.R. 50 (1975); *Ortiz v. Cruz Pabón*, 103 D.P.R. 939 (1975). En el caso de autos la parte recurrente no ha demostrado que existan estas circunstancias.

En cuanto al estudio objetado y a la alusión que hace el tribunal de instancia al mismo, cabe señalar que la objeción iba dirigida a pedir que no se tomara en consideración el aspecto sustantivo del estudio, fundamentada primordialmente en que éste carecía de rigor científico. Ante tal planteamiento se acordó que no se entraría en el contenido, pero que sería admisible con el propósito de demostrar las gestiones que se hicieron con las autoridades universitarias para que se implantaran medidas conducentes a prevenir agresiones sexuales en el Recinto. Ese fue básicamente el valor probatorio que el tribunal de instancia le dio al mismo. Su uso se circunscribió al propósito limitado con que se ofreció y aceptó.

En resumen, en *Estremera v. Inmobiliaria Rac, Inc.*, supra, págs. 855–856, expresamos:

> El incremento de la violencia, el reto del criminal a la paz y sosiego del pueblo y la creciente probabilidad de que una persona sea víctima de un atentado contra su vida, su libertad o su propiedad, *es una enfermedad del medio ambiente en que las personas nacen, se educan, trabajan o simplemente existen*. Es condición o circunstancia de la atmósfera general en que se desarrolla la gestión vital de cada miembro de la sociedad; y es, primordialmente, problema de seguridad *pública y responsabilidad del Estado* la única entidad con los recursos y la fuerza necesaria para mantener la paz y la majestad de la Ley. Si tal es el ámbito en que se vive y se contrata, y tal la indefensión del pueblo contra ese tercero violento, *los contratantes no pueden ser responsables de la irrupción del crimen en el campo de sus negocios* . . . . (Énfasis suplido.)

Lo resuelto hoy *en nada altera dicha doctrina*. La norma general continúa siendo que no se es responsable de la criminalidad general que exista en el ambiente de la sociedad en que la persona se desenvuelve, y que una entidad o institución no es un asegurador de la seguridad de las personas con las que se relaciona o la patrocinan. Sin embargo, dicha norma general no aplica cuando se llevan a cabo actividades que por su *"naturaleza esencial"* hacen necesario que la entidad o institución venga obligada "a ofrecer un grado de protección y seguridad *independiente* del que puedan proveer las agencias de seguridad pública". (Énfasis suplido.) *Estremera v. Inmobiliaria Rac, Inc.*, supra, pág. 856. El Recinto de Río Piedras de la U.P.R. lleva a cabo actividades de esta naturaleza.

En este caso se demostró a cabalidad que dicho Recinto incumplió con su deber de ofrecer adecuada protección y seguridad a sus estudiantes, que ese incumplimiento fue la causa adecuada del daño ocasionado por el acto intencional

de un tercero y que el daño era previsible. Bajo estas circunstancias específicas, no cabe duda que la U.P.R. responde por los daños ocasionados por el acto intencional de un tercero.

## VI

*Los daños*

No hay duda que las víctimas de violación sufren innumerables traumas que comprenden desde el ataque a la integridad corporal hasta las más severas lesiones psicológicas y abuso a su dignidad como ser humano. Estos daños perduran por prolongados períodos y hasta podrían afectar a la víctima por el resto de su vida. J.M. Massaro, *Rape Trauma Syndrome*, 69 Minn. L.R. 395–470 (1984).

En relación con los daños, hay que tener presente el principio firmemente establecido de que éstos no tienen que probarse con certeza matemática. *Colombani v. Gob. Municipal de Bayamón*, 100 D.P.R. 120 (1971); *Murcelo v. H.I. Hettinger & Co.*, 92 D.P.R. 411 (1965). Una persona que ha sido víctima de violación sufre no sólo de un abusivo ataque físico sexual, sino que además es víctima de una experiencia deshumanizadora y emocionalmente avasalladora cuyos efectos pueden durar indefinidamente. "Hoy día, diversos estudios científicos demuestran que desde sus inicios, la mayoría de las víctimas experimentan no sólo el ataque a su integridad corporal, sino diversas lesiones severas, de carácter psicológico, que oscilan desde miedo, ansiedad, paranoia, depresión, confusión, sensibilidad interpersonal, auto-estima [baja] y [problema de] ajuste social. Se ha confirmado que estos efectos perduran más tiempo de lo que originalmente se pensaba." *Pueblo v. Mattei Torres*, 121 D.P.R. 600 (1988).

Sobre el particular también se ha dicho lo siguiente:

The experience of rape creates a disruption in life style that realistically could last a lifetime. *The physical trauma—that which is visibly noted and treated—quickly heals, creating the illusion of recovery. Unfortunately, the real trauma, because it is not of physical origin, frequently goes unnoticed and unattended.*

The common pattern of public blame and skepticism encourages the victim to harbor emotional injury and pain. This process results in longterm psychological and emotional symptoms that are dealt with in a "surface-suppression-resurface" cycle. (Énfasis suplido.) C.G. Warner, *Rape and Sexual Assault, Management and Intervention*, London, Aspen Pub., 1980, pág. 221.

El trauma posterior sufrido por una víctima de violación es muy difícil y en ocasiones hasta imposible de superar. Los efectos negativos afectan todos los aspectos de la vida de la persona, por lo que se le hace muy difícil volver a llevar una vida normal.[11]

 A diferencia de otros casos de daños y perjuicios, incluso en aquellos en que ha mediado una muerte, la víctima de violación sufre otros efectos además de los que se ocasionan como resultado del ataque físico y sexual. "Frecuentemente se produce un 'segundo ataque' contra la víctima; éste lo ocasionan los juicios y actitudes de las personas a su alrededor que aunque probablemente involuntarios, provocan un impacto igualmente devastador. El 'segundo ataque' no es un simple reflejo de la conducta o las actitudes de un individuo o grupo en relación a una víctima en específico. Más bien es reflejo de un contexto social más amplio en relación con la violación; es la unión de las actitudes históricas y contemporáneas que existen en cuanto a la figura del hombre y la mu-

---

[11] Hoy en día surge como agravante a toda esta tragedia humana el espectro del Síndrome Inmunológico de Deficiencia Adquirida (S.I.D.A.).

jer, de sus relaciones, y lo que se espera por parte de ellos como conducta apropiada. Para la mujer que ha sido violada la esencia del 'segundo ataque' lo constituye la incredulidad, la culpa y hasta la condena que emerge de la sociedad, de su comunidad, de sus propios sentimientos de culpa (como resultado de la internalización de las actitudes de otros), de su familia o cualquier otra persona significativa en su vida." (Traducción nuestra.) J.E. Williams y K.A. Holmes, *The Second Assault, Rape and Public Attitudes*, Connecticut, Greenwood Press, 1981, Prólogo, pág. XI. Todo lo anterior se agrava cuando la mujer tiene, como normalmente ocurre, que comparecer ante los tribunales, los cuales aún no han sido depurados del todo de ese tipo de actitud.[12] Véanse: H.S. Feild y L.B. Bienen, *Jurors and Rape: A Study in Psychology and Law*, Lexington, D.C. Heath and Company, 1980; A.M. Scacco, *Male Rape*, Nueva York, A.M.S. Press, Inc., 1982.

La prueba en este caso claramente demostró que la codemandante Elba A.B.M. no ha podido superar el trauma que le causó la violación de que fue objeto. Toda su vida se ha visto afectada, así como también se ha afectado la vida de su familia, las personas con quienes ella comparte día a día. A la codemandante Elba A.B.M., luego del incidente, se le ha hecho imposible llevar una vida normal. El trauma podría durar toda su vida.

---

[12] En *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980), se declaró inconstitucional una disposición procesal que requería corroboración del testimonio de la víctima cuando ésta había tenido previamente relaciones amorosas o íntimas con su agresor. Ante ello este Tribunal expresó que "[e]llo es una afrenta a su dignidad que agrava la lesión física sufrida y contribuye a que sea *víctima de dos ofensas*, la del ataque sexual y la de la sociedad". (Énfasis suplido.) Íd., pág. 732.

Se agregó más adelante que "hay factores que vigorosamente actúan como disuasivos a la radicación de una causa por violación, a saber, las molestias, contratiempos y vejámenes del proceso, así como el *estigma imborrable* que acarrea para las víctimas". (Énfasis suplido.) *Com. de la Mujer v. Srio. de Justicia*, supra, pág. 736.

De acuerdo con el *Diagnostic & Statistical Manual of Mental Disorders*, 3ra ed., Washington, D.C., The American Psychiatric Association, 1987, Sec. 309.89, págs. 247–249, la violación se reconoce como uno de los eventos que comúnmente produce una condición clasificada como *post-traumatic stress disorder*:

The essential feature of this disorder is the development of characteristic symptoms following a psychologically distressing event that is outside the range of usual human experience . . . . The stressor producing this syndrome would be markedly distressing to almost anyone, and is usually experienced with intense fear, terror, and helplessness. The characteristic symptoms involve reexperiencing the traumatic event, avoidance of stimuli associated with the event or numbing of general responsiveness, and increased arousal.

*"The trauma may be experienced alone (e.g., rape or assault) or in the company of groups of people (e.g., military combat) . . . ."* The disorder is apparently more severe and longer lasting when the stressor is of human design . . . .

The traumatic event can be reexperienced in a variety of ways . . . . There is often intense pyschological distress when the person is exposed to events that resemble an aspect of the traumatic event or that symbolize the traumatic event . . . such as anniversaries of the event . . . . .

. . . . . . . .

*In addition to the reexperiencing of the trauma, there is persistent avoidance of stimuli associated with it,* or a numbing of general responsiveness that was not present before the trauma. *The person commonly makes deliberate efforts to avoid thoughts or feelings about the traumatic event and about activities or situations that arouse recollections of it . . . .*

Diminished responsiveness to the external world, referred to as "psychic numbing" or "emotional anesthesia," usually begins soon after the traumatic event. A person may complain of feeling detached or estranged from other people, that he or she has lost the ability to become interested in previously enjoyed activities, or that the ability to feel emotions of any type, especially those associated with intimacy, tenderness, and sexuality, is markedly decreased.

Persistent symptoms of increased arousal that were not present before the trauma include difficulty falling or staying asleep (recurrent nightmares during which the traumatic event is relived are sometimes accompanied by middle or terminal sleep disturbance), hypervigilance, and exaggerated startle response. Some complain of difficulty in concentrating or in completing tasks. Many report changes in aggression. In mild cases this may take the form of irritability with fears of losing control. In more severe forms, particularly in cases in which the survivor has actually committed acts of violence (as in war veterans), the fear is conscious and pervasive, and the reduced capacity for modulation may express itself in unpredictable explosions of aggressive behavior or an inability to express angry feelings.

Symptoms characteristic of Post-traumatic Stress Disorder, or physiologic reactivity, are often intensified or precipitated when the person is exposed to situations or activities that resemble or symbolize the original trauma . . . .

. . . Symptoms of depression and anxiety are common, and in some instances may be sufficiently severe to be diagnosed as an Anxiety or Depressive Disorder . . . . There may be symptoms of an Organic Mental Disorder, such as failing memory, difficulty in concentrating, emotional l[i]ability, headache, and vertigo . . . .

. . . . . . . . .

. . . Symptoms usually begin immediately or soon after the trauma. Reexperiencing symptoms may develop after a latency period of months or years following the trauma, though avoidance symptoms have usually been present during this period.

*Impairment may be either mild or severe and affect nearly every aspect of life. Phobic avoidance of situations or activities resembling or symbolizing the original trauma may interfere with interpersonal relationships such as marriage or family life.* Emotional l[i]ability, depression, and guilt may result in self-defeating behavior or suicidal actions . . . . (Énfasis suplido.)

En el caso de autos, además del trauma sufrido por la violación y como parte integral de los sucesos, pero con un

peso particular sobre toda la experiencia vivida por la code-
mandante, se distingue la realidad de que tuvo que dar
muerte a otro ser humano. Luego, tuvo que enfrentarse a la
angustiosa decisión de tener que compartir una ambulancia
con su atacante moribundo o bajarse, estando física y emo-
cionalmente maltrecha, y sin aparentes medios de transpor-
tación para trasladarse a un hospital. Gracias a la ayuda de
otro estudiante que la llevó al hospital pudo recibir atención
médica para sus heridas físicas. Aun cuando la muerte del
atacante fue en defensa propia y básicamente accidental, en
la mente de la joven estudiante está presente el hecho de que
privó de la vida a un ser humano. En nuestra sociedad, los
valores sociales, morales y religiosos ponen gran énfasis,
precisamente, en el respeto a la vida humana.[18] Indepen-
dientemente de cómo ocurra, la privación de la vida para no-
sotros es, de por sí, una experiencia traumática, fuera del
campo normal de eventos. Este hecho por sí solo, sin los
agravantes presentes en este caso, es suficiente para crear
una condición de serias angustias mentales.

▉ La magnitud de los daños que la codemandante
Elba A.B.M. y su familia han sufrido es indudable. No obs-
tante, la parte recurrente nos pide que modifiquemos las

---

[18] Ejemplos de su preponderancia en nuestra sociedad pueden apreciarse
en los debates e informes de la Asamblea Constituyente. Así, en lo relativo a la
prohibición de la pena de muerte, se señaló que, "[a]l eliminarla por precepto
constitucional se expresa la posición moral del pueblo puertorriqueño acerca del
valor inviolable de la vida humana". 4 Diario de Sesiones de la Convención Cons-
tituyente 2566 (1952). Referente a lo mismo, señaló el Lcdo. Jaime Benítez:
"La sección ocho establece inmediatamente el principio de que en Puerto
Rico no existirá jamás la pena de muerte. Hemos creído propio incorporar esta
básica actitud humana para subrayar también cómo entiende la Comisión de [la]
Carta de Derechos, *que la vida del ser humano, es algo de máximo valor, de la
máxima respetabilidad* y que el Estado, no importa las cuestiones que puedan
impelerlo a ello, no está justificado en privar a nadie de tal vida. Y si el Estado, el
creador de derechos dentro del orden social, no puede hacerlo, *a fortiori*, no
puede hacerlo tampoco ningún ciudadano privado." (Énfasis suplido.) 2 Diario de
Sesiones de la Convención Constituyente 1104–1105 (1952).

sumas concedidas por el tribunal de instancia para reba-jarlas. Ante reclamos similares, en varias ocasiones nos hemos expresado sobre la difícil y hasta angustiosa tarea de estimación y valoración de daños. "Esta función descansa so-bre el ejercicio discrecional prudente, juicioso y razonable del juzgador de hechos animado por un sentido de justicia y de conciencia humana." *Urrutia v. A.A.A.*, 103 D.P.R. 643, 647 (1975). "No hay duda de que en relación con esta difícil y angustiosa labor de estimación de daños, los tribunales de instancia, de ordinario, están en una mejor posición que los tribunales apelativos para evaluar la situación por cuanto son los que tienen contacto directo con la prueba que a esos efectos presenta la parte que los reclama . . . . Ahí la razón para la norma de abstención judicial; esto es, de que este Tribunal no intervendrá con la decisión que a ese respecto emitan los tribunales de instancia a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas." *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 451 (1985), y casos allí citados.

En *Rodríguez Cancel v. A.E.E.*, supra, pág. 452, re-calcamos que, "[c]omo sabemos, no hay dos casos exacta-mente iguales; cada caso se distingue por sus propias y va-riadas circunstancias. Es por ello que —a pesar de que es aconsejable que los tribunales de instancia utilicen como guía o punto de partida las cuantías concedidas por este Tri-bunal en casos 'similares' anteriores— la decisión que se emita en un caso específico en relación con esta materia no puede ser considerada como precedente obligatorio para otro caso. *Vda. de Silva v. Auxilio Mutuo*, 100 D.P.R. 30 (1971); *Baralt v. Báez*, 78 D.P.R. 123 (1955)".

En la presente acción las sumas concedidas no son exageradamente altas. Hay que tomar en consideración la magnitud del estigma emocional sufrido por la codeman-

dante y la correlativa angustia de sus padres, que comprende no solamente la traumatizante experiencia de una violación sexual y la anómala y dolorosa vivencia de haber tenido que dar muerte a otro ser humano en defensa de su vida y de su honor, sino además el "segundo ataque" a su autoestima ocasionado por los juicios y actitudes de la sociedad y de las personas a su alrededor.

Si bien es cierto, como señala la parte recurrente al cuestionar la cuantía concedida en daños, que la codemandante no ha entrado en la sicoterapia intensiva que se le recomendó, hay que entender que esta actitud es precisamente parte integrante del daño emocional que se le ha causado. El trauma recibido no le permite aceptar la sicoterapia. Esta actitud es característica de quien sufre una experiencia de tal magnitud. Las personas bajo estas circunstancias intentan evadir aquellas situaciones que de alguna forma le recuerdan lo que quieren olvidar.

El error señalado no se cometió.

## VII

*La temeridad*

Como último error, señalan las recurrentes que no procede la imposición de honorarios de abogado e intereses por temeridad. Alegan que no fueron temerarios al defenderse de la reclamación. Se fundamentan principalmente en que, de acuerdo con el estado de derecho vigente, todo indicaba que no existía responsabilidad por actos criminales cometidos por terceras personas. Citan en apoyo a *Estremera v. Inmobiliaria Rac, Inc.*, supra. A pesar de haber interpretado erróneamente el alcance de dicho caso, les asiste la razón. Los honorarios de abogado y los intereses por temeridad sólo proceden cuando la parte perdidosa ha incurrido en temeridad. Reglas 44.1(d) y 44.3(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III. La determinación de temeridad des-

cansa en la sana discreción del tribunal. *Asociación de Condóminos v. Trelles Reyes*, 120 D.P.R. 574 (1988); *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713 (1987); *Raoca Plumbing v. Trans World*, 114 D.P.R. 464, 468 (1983); *Raluan Corp. v. Feliciano*, 111 D.P.R. 598 (1981). En ausencia de una demostración por la parte recurrente de que se ha cometido un abuso de discreción, no revisaremos esta determinación. *Montañez Cruz v. Metropolitan Cons. Corp.*, 87 D.P.R. 38, 40 (1962). Una vez se determina la temeridad, la imposición de honorarios de abogado e intereses por temeridad es imperativa. *Fernández v. San Juan Cement Co., Inc.*, supra; *Monrozeau v. Srio. de Justicia*, 121 D.P.R. 885 (1988); *Pereira v. I.B.E.C.*, 95 D.P.R. 28, 70 (1967); *Montañez Cruz v. Metropolitan Cons. Corp.*, supra, pág. 39.

 La condena al pago de honorarios de abogado e intereses por temeridad tiene como propósito el desalentar la litigación innecesaria, ayudando de esta manera a hacer viable y a garantizar una solución justa, rápida y económica del asunto ante la consideración del tribunal. Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III; *Fernández v. San Juan Cement Co., Inc.*, supra; R.E. Bernier, *El derecho de accesión en Puerto Rico*, Barcelona, 1970, págs. 30–31. Hemos resuelto que "la acción que amerita la condena de honorarios de abogado es cualquiera que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente, o que produzca la necesidad de que otra parte incurra en gestiones evitables". (Citas omitidas.) *Fernández v. San Juan Cement Co., Inc.*, supra, págs. 718–719. "[L]a 'temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia'. H. Sánchez, *Rebelde Sin Costas*, 4(2) Boletín Judicial 14 (1982)." *Fernández v. San Juan Cement Co., Inc.*, supra, pág. 718.

■ En reiteradas ocasiones hemos expresado que no incurre en temeridad una parte que litiga una cuestión que "tiene acogida y adjudicación por primera vez en la jurisprudencia patria", *Brea v. Pardo*, 113 D.P.R. 217, 226 (1982), ni cuando el caso es complejo en el cual se hacen planteamientos novedosos. *A.E.E. v. Las Américas Trust Co.*, 123 D.P.R. 834 (1989); *García Larrinua v. Litchig*, 118 D.P.R. 120 (1986); *M. Quilichini Sucrs. v. Villa Inv. Corp.*, 112 D.P.R. 322, 328 (1982); *Rodríguez v. John Hancock Mutual Life*, 110 D.P.R. 1, 8 (1980); *Caloca v. C.I.A.A.*, 108 D.P.R. 164, 173 (1978); *Admor. F.S.E. v. Flores Hnos. Cement Prods.*, 107 D.P.R. 789 (1978); *Pereira v. I.B.E.C.*, supra; *United Hotels of P.R. v. Willig*, 89 D.P.R. 188, 196 (1963).

■ El asunto planteado en este caso es novel. Un examen y análisis minucioso del récord reflejan que la parte demandada durante el curso de la litigación no incurrió en conducta contumaz, obstinada, terca o rebelde, ni insistió en una actitud desprovista de fundamentos que apuntale una determinación de temeridad al amparo de las Reglas 44.1(d) y 44.3(b) de Procedimiento Civil, *supra. A.E.E. v. Las Américas Trust Co.*, supra; *Fernández v. San Juan Cement Co., Inc.*, supra; J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1986, Cap. VII, págs. 242–252.

Por todo lo antes expuesto, *se dictará sentencia que modifique la dictada por el Tribunal Superior, Sala de San Juan, a los únicos efectos de revocar la determinación de honorarios de abogado e intereses concedidos por temeridad y, así modificada, se confirma la sentencia recurrida.*

El Juez Asociado Señor Negrón García emitió opinión concurrente y de conformidad. El Juez Asociado Señor Ortiz se inhibió.

—O—

Opinión concurrente y de conformidad del Juez Asociado Señor Negrón García.

Al suscribir la opinión del tribunal consignamos separadamente ciertos fundamentos adicionales en abono de este justo precedente en el ámbito de la responsabilidad extracontractual. La crudeza de los hechos y la magnitud y naturaleza de los daños lo ameritan.

## I

La experiencia vital puede a veces rebasar la más enfermiza de las imaginaciones humanas. La dura realidad excede en ocasiones —por anchísimo margen— lo que el morboso delirio de un demente puede concebir. Tal es el caso de la aterradora noche que le tocó en desdicha a esta joven universitaria. En definitiva, nada, absolutamente nada, borrará de su cuerpo y de su alma el estrago indescriptible que le deparó la vida. No es necesaria la condición de perito ni de experimentado en la condición humana para comprender el espanto de una experiencia que sobrecoge profundamente al más insensible.

Temor, angustia, vergüenza, consternación, dolor implacable: todo debe haberse apoderado de esta joven mujer en esa hora pavorosa.(1) La intimidad de su cuerpo, hecha para

---

(1) Sobre el tema de la violación hemos señalado:

"'Toda sociedad tiene sus agresores sexuales. Se ha demostrado la existencia de los siguientes tipos:

"'. . . encontramos entre los casos de violadores al *asaltante agresivo sadista*, para quien la gratificación sexual debe estar precedida, acompañada o seguida de violencia física. Estos hombres odian las mujeres, usualmente actúan solos, frecuentemente usan armas, son indiferentes al atractivo físico de sus víctimas, y muchas veces no pueden culminar el acto sexual. Una segunda variedad es el *delincuente amoral* cuyo concepto de la mujer es aquél de que ella es un mero objeto de placer sexual. Es hedonista, deficiente en sus controles sociales, y

la caricia consentida, para el disfrute del amor en su expresión más tierna, fue violada brutalmente sin que hubiese para ella el más leve resquicio de respeto. Por el contrario, el furor más salvaje dañó para siempre lo que para ella era inviolable, excepto por la voluntad del amor.

Y al final, para salvarse, para no morir por la injuria física y moral, o lo que es igual, para no perecer de asco, una salida igualmente aterradora. Tiene que echar mano del arma blanca usada por el violador para, a su vez, liberarse siquiera por un instante del estigma indeleble que —a fin de cuentas— ya nunca podría borrarse del espíritu. Salvó su vida precariamente, pero el daño quedó y permanecerá para siempre como una huella que jamás podrá desvanecerse.

## II

El Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141, en una de sus modalidades responsabiliza a todo aquel que por omisiones culposas o negligentes le causa daños a

---

no es sadista ni hostil a sus víctimas, aun cuando usará la fuerza para dominar cualquier resistencia. También el *agresor sexual*. El patrón de conducta de estos violadores, bajo influencia del alcohol [o de alguna otra sustancia], puede variar desde intentos torpes para ganar aceptación de las mujeres, a quienes erróneamente creen amenas, hasta la de aquellos hombres sobre quienes el alcohol tiene el efecto de desencadenar violencia patológica potencial.

"'La violación es a veces cometida como un acto explosivo por hombres de quien la agresión sexual repentina resulta aparentemente inexplicable, aunque a través de un estudio se revela evidencia psicótica. Existen también aquellos violadores que aplican estándares dobles, diferenciando la mujer buena de la mala, y racionalizando el uso o amenaza de la fuerza, para compeler a la mujer a hacer buena su conducta implícita. (Tales como el haberle aceptado unos tragos, haberse subido en su automóvil, visitado su apartamento, o haberle permitido ciertas libertades con su cuerpo.) Frecuentemente, la violación por este tipo de agresor es una respuesta a lo que interpretan como una conducta provocativa de la mujer. El violador puede también ser un deficiente mental, un psicótico o una mezcla de los tipos antes descritos.' D. MacNamara, *Sex Offenses and Sex Offenders*, 376 Annals of Am. Acad. of Political & Social Science 139, 151–152 (1968). (Traducción nuestra.)" *Pueblo v. Mattei Torres*, 121 D.P.R. 600, 614–615 (1988). Véanse: *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980); *Pueblo v. Rivera Robles*, 121 D.P.R. 858 (1988).

otro. Probados los daños, en el presente caso nos enfrentamos a la ya famosa tarea propia de la responsabilidad extracontractual: determinar si la conducta de la parte demandada configura un acto culposo que tenga un nexo causal con la lesión física y emocional de la parte demandante. I.H. Goldenberg, *La relación de causalidad en la responsabilidad civil*, Buenos Aires, Ed. Astrea, 1984.

"La culpa consiste en la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el resultado dañoso." C. Rogel Vide, *La Responsabilidad Civil Extracontractual*, Ed. Civitas, 1976, pág. 90. La diligencia exigible es la que cabe esperar del ser humano medio, el buen *pater familias*. Si el daño es previsible por éste hay responsabilidad. Si no es previsible estamos generalmente en presencia de un caso fortuito. Rogel Vide, *op. cit.*, pág. 91. *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700, 704 (1982).

¿Incurrió la Universidad de Puerto Rico en conducta negligente propiciadora de los actos ilícitos de un terecero extraño? Aunque esta institución no es aseguradora absoluta de todo riesgo imaginable a sus profesores y estudiantes, en las circunstancias de autos indudablemente sí. La obscuridad producto de la falta de alumbrado, las condiciones del paisaje y de la profusa vegetación, la omisión en adoptar medidas para sustituir los dos (2) guardias que debían prestar vigilancia esa noche en el lugar de los hechos, el conocimiento previo de las autoridades universitarias acerca de la clasificación de lugar como área de alto riesgo de ataques sexuales, la ausencia de un plan de seguridad y la dejadez exhibida ante las medidas cautelares y correctivas propuestas de antemano por estudiantes y profesores de la Escuela Graduada de Trabajo Social, demuestran claramente el incumplimiento del deber de cuidado.

Y es claro el nexo causal entre esa conducta y los daños sufridos por los demandantes. Con mayor probabilidad el acto culposo no hubiera acontecido si la Universidad de

Puerto Rico hubiese cumplido con su responsabilidad. Su conducta general propició las condiciones para que el tercero produjera el daño. La negligencia imputable a la Universidad de Puerto Rico creó la situación de peligro sobre la cual actuó esa tercera fuerza. Se trata de un acto razonablemente predecible. Tan probable era, que este tipo de ataque sexual no sólo había sido objeto de un estudio especial en el propio Recinto sino que, en sus diferentes modalidades, constaba en el Libro de Novedades de la propia guardia universitaria.

## III

Ante este precedente que fija responsabilidad a la Universidad de Puerto Rico en este caso por actos cometidos por un tercero, es menester subrayar las peculiaridades[2] que presenta esta institución educativa. No se trata de un lugar público más. Cuando hablamos de la Universidad de Puerto Rico —al igual que otros centros docentes similares— la palabra *recinto* aflora ineludiblemente en toda su dimensión. Presupone un concepto particular del espacio, que no se ajusta con exactitud a la idea general de paraje abierto, disponible para la libre circulación o para el disfrute absoluto a voluntad ciudadana. El predio universitario no es exactamente una calle, una plaza, un terreno despejado para el tránsito cotidiano o para cualquier actividad de la ciudadanía.

La universidad responde a unas condiciones y propósitos específicos. Se trata de un área geográfica limitada dentro de la cual convive —en un horario también restringido— una comunidad particular. A ella acude una población a rendir

---

[2] "El Código Civil tiene provista la norma de responsabilidad relativa, conjugada con la clase de actividad, en su Art. 1057 (31 L.P.R.A. sec. 3021) que ordena: '[L]a culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación, y corresponda a las circunstancias de las personas, del tiempo y del lugar...'." *Estremera v. Inmobiliaria Rac, Inc.*, 109 D.P.R. 852, 856 (1980).

unos servicios especializados y otra a recibirlos. Aunque "debe estar abierta a los aires de extramuros, al fluir incesante de ideas y opiniones que expongan al estudiante a ese mundo complejo y conflictivo del conocimiento" —*De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472 (1989), opinión disidente— la Universidad de Puerto Rico es precisamente una de esas entidades que, como señaláramos en *Estremera v. Inmobiliaria Rac, Inc.*, 109 D.P.R. 852 (1980), despliegan unas actividades que requieren el ofrecimiento de seguridad y protección que no dependa exclusivamente de las agencias tradicionales de seguridad pública. Por imperativo ha de contar con un plan de vigilancia adecuado y una guardia entrenada especialmente para llevar a cabo esas tareas, lo cual, incidentalmente, es compatible con su política oficial de desalentar la presencia de la Policía estatal o cualesquiera otros cuerpos análogos en el recinto.

## IV

Finalmente, ante la magnitud de los daños probados, no vemos razón alguna en justicia para reducir las indemnizaciones adjudicadas por el tribunal de instancia. Estamos contestes con la revocación de la determinación de honorarios de abogado e intereses, por no configurar el procesamiento de la acción por la Universidad de Puerto Rico un curso temerario. *Santos Bermúdez v. Texaco de P.R., Inc.*, 123 D.P.R. 351 (1989).