El Juez Presidente Señor Hernández Denton
emitió la opinión del Tribunal.
Nos corresponde determinar qué efecto tiene la confir-mación de un plan de reorganización bajo el Capítulo 11 del Código de Quiebras, 11 U.S.C.A. secs. 1101-1174 (Capítulo 11), sobre un pleito pendiente ante nuestros tribu-nales cuando la Corte de Quiebras autorizó que se conti-nuara con dicho pleito. Por entender que en este caso el contenido del plan de reorganización constituye un impe-dimento colateral por sentencia en cuanto a la cuantía adeudada, revocamos la sentencia recurrida. Asimismo, re-vocamos la imposición del interés legal por temeridad.
H-l
En 1981 los hermanos Reyes, Ramón, Rafael y Daniel Marrero Rosado crearon, mediante pacto verbal, una socie-dad que denominaron “La Ceibeña”, para operar una pa-nadería con el mismo nombre. Posteriormente, en 1986, suscribieron un contrato de arrendamiento de un local ubi-cado en el municipio de Vega Baja y allí abrieron otra pa-nadería, “La Nueva Ceibeña”. Luego de varios años salie-ron de la sociedad Rafael y Daniel Marrero Rosado, y entraron, no como propietarios sino como socios de ganan-cias y pérdidas, los Srs. Ismael Marrero Rosado y Raúl Marrero Nazario, quienes también son miembros de la familia. A mediados de los noventa, la panadería “La Cei-beña” cerró, por lo que el único negocio de la sociedad era la panadería “La Nueva Ceibeña”. Esta era administrada por el Sr. Ramón Marrero Rosado y los demás socios pasaron a trabajar allí.
*484 En junio de 1998, los Srs. Reyes e Ismael Marrero Ro-sado interpusieron una demanda en el Tribunal de Pri-mera Instancia, Sala de Bayamón, contra el Sr. Ramón Marrero Rosado. Adujeron que éste no les había satisfecho las cuantías correspondientes a sus participaciones en las ganancias de la sociedad desde 1995 y que les debía a cada uno $221,832. Por su parte, el Sr. Ramón Marrero Rosado reconvino y alegó que la sociedad había quedado disuelta en marzo de 1998 al concluir el contrato de arrendamiento, del local donde ubicaba “La Nueva Ceibeña”. Adujo, ade-más, que lo único que quedaba pendiente era la liquidación de la referida sociedad.
Así las cosas, el Sr. Ramón Marrero Rosado presentó una petición voluntaria de reorganización bajo el Capítulo 11. La interposición de dicha petición de quiebra tuvo el efecto, como resultado de la paralización automática (automatic stay), de detener los procedimientos ante el foro estatal. Poco tiempo después, el Sr. Ramón Marrero Ro-sado instó una acción ante la Corte de Quiebras (adversary proceeding) contra los señores Reyes e Ismael Marrero Ro-sado y Raúl Marrero Nazario. Éste alegó que los allí de-mandados interferían con las operaciones de su negocio y solicitó una orden de entredicho permanente. Por su parte, los demandados en dicho pleito reconvinieron y adujeron que la solicitud de reorganización presentada por el señor Ramón Marrero Rosado respondía al propósito de privarlos de sus derechos en la partición de la sociedad.
Luego de varios incidentes procesales y de que ambas partes presentaran mociones de sentencia sumaria, la Corte de Quiebras emitió una orden en febrero del 2000. En ella denegó las respectivas mociones de sentencia su-maria por considerar que existía una controversia de he-chos relativa a si la sociedad había sido disuelta conforme a las disposiciones del Código Civil de Puerto Rico. En lo pertinente, en la orden se dispuso:
[T]he parties disagree, and the record fails to demonstrate, *485 whether or not the partnership was appropriately dissolved under the Puerto Rico Civil Code. It is not clear whether the business, for which the partnership was constituted, ended. ...
... In the interests of judicial economy and there being material issues of fact in controversy in the record before the Court, the Court finds that the Bayamón court is in a better position to resolve the matter. ...
For the foregoing reasons, the parties’ motion for summary judgment will be denied. The Court will lift the automatic stay and allow the defendants to proceed with the state court action. The Court will hold in abeyance the defendant’s motion to dismiss and the debtor’s opposition in the legal case until this matter is resolved in state court. (Escolio omitido.) Apén-dice, pág. 44.
Luego de que la Corte de Quiebras emitiera la referida orden, los procedimientos en el Tribunal de Primera Ins-tancia se reactivaron y continuaron de forma simultánea al procedimiento de quiebra. En abril de 2001, el foro federal aprobó el plan de reorganización sometido por el Sr. Ra-món Marrero Rosado sin oposición de los señores Reyes, Ismael Marrero Rosado y Raúl Marrero Nazario, a pesar de que éstos fueron notificados de las distintas etapas del procedimiento. Dicha orden advino final y firme en mayo de 2001.
El plan de reorganización aprobado estableció que los señores Reyes, Ismael Marrero Rosado y Raúl Marrero Na-zario eran “contingent and disputed unsecured creditors” y se calculó, para efectos del plan, que el monto agregado de sus reclamaciones era $30,000. En lo pertinente a la con-troversia ante nos, el plan de reorganización establece:
Reyes Marrero Rosado, Ismael Marrero Rosado and Raúl Marrero Nazario have been listed in debtor’s schedules as contingent and disputed unsecured creditors of the herein estate. These parties have not filed any proof of claim in this case and these remain as unliquidated amounts as of this date. Considering the ongoing litigation process ordered by the Honorable Court the claim liquidation of these parties would unduly delay the closing of the herein case. Pursuant to 11 U.S.C. Section 502(c), debtor estimates for purposes of potential alio- *486 wance for debt under this class the aggregate amount of $30,000.00 for all creditors included. Apéndice, pág. 54.
Meses más tarde, la Corte de Quiebras emitió la senten-cia final {Final Decree) y dispuso definitivamente del caso. Mediante la referida sentencia, la Corte de Quiebras or-denó el relevo de todas las deudas descargables, excepto lo dispuesto en el plan de reorganización, y puso fin a los demás asuntos ante su consideración, ordenando así el ar-chivo del caso.
Dos años después de que concluyeran los procedimien-tos en la Corte de Quiebras, el Sr. Ramón Marrero Rosado presentó ante el Tribunal de Primera Instancia una mo-ción de sentencia sumaria y, en la alternativa, solicitó que se desestimara la demanda en su contra. Adujo que la con-troversia se había tornado académica, o era cosa juzgada, pues la Corte de Quiebras había dispuesto que su obliga-ción con los demandantes quedó extinguida y que sólo te-nía que pagarles la cantidad dispuesta en el plan de reorganización. El foro de instancia denegó dicha moción.
Inconforme, el Sr. Ramón Marrero Rosado acudió al Tribunal de Apelaciones. El referido foro resolvió que la Corte de Quiebras dejó sin efecto la paralización automática para que el tribunal estatal determinara si la sociedad había quedado disuelta y si procedía su liquidación. Según la re-solución emitida por el Tribunal de Apelaciones, lo estable-cido en el plan de reorganización constituiría una defensa de cosa juzgada o impedimento colateral sólo si el foro pri-mario encontraba que la sociedad había sido disuelta. Como consecuencia, denegó el auto y los procedimientos continuaron ante el Tribunal de Primera Instancia.
Posteriormente, el 28 de febrero de 2007, el Tribunal de Primera Instancia determinó mediante resolución que la sociedad había quedado disuelta por mutuo acuerdo entre los socios en marzo de 1998, cuando finalizó el contrato de arrendamiento del local donde ubicaba “La Nueva Ceibeña”. En su resolución, el foro primario dispuso que se *487 dictaría la sentencia final una vez se recibiera el informe de la contable designada por el tribunal para determinar las cantidades adeudadas por el Sr. Ramón Marrero Ro-sado a cada socio en la liquidación de la sociedad. Luego de ello, el tribunal acogió el referido informe pericial y dictó sentencia final en agosto de 2007. En ésta, el tribunal con-denó al Sr. Ramón Marrero Rosado a pagar $118,772 a favor del Sr. Raúl Marrero Rosado, y de $49,417 a favor del Sr. Ismael Marrero Rosado. Además, le condenó al pago del interés legal sobre las referidas cantidades desde la fecha de la interposición de la demanda.
Inconforme con dicha sentencia, el Sr. Ramón Marrero Rosado acudió al Tribunal de Apelaciones y alegó que el foro primario erró al emitir una sentencia a pesar de que, a su juicio, la controversia se había tornado académica, o aplicaba la doctrina de cosa juzgada o de impedimento co-lateral por sentencia. Adujo también que se le violó su de-recho al debido proceso de ley al haberse admitido el in-forme de la contable a pesar de sus objeciones. Por último, argüyó que el Tribunal de Primera Instancia erró al conde-narlo al pago del interés legal desde la interposición de la demanda porque estaba protegido por la paralización auto-mática, al menos hasta la conclusión de los procedimientos de quiebra y que, en todo caso, no proceden porque la can-tidad dispuesta en el plan de reorganización es el máximo que está obligado a pagar.
El Tribunal de Apelaciones confirmó la sentencia recurrida. En cuanto a los argumentos de academicidad, cosa juzgada e impedimento colateral, estimó que no pro-cedían porque la Corte de Quiebras cedió por completo su jurisdicción al foro estatal, por lo que ninguna controversia al respecto fue adjudicada en ambos foros. El foro apelativo intermedio consideró, además, que el Sr. Ramón Marrero Rosado tuvo la oportunidad de contrainterrogar a la conta-ble y que el informe que ésta sometió fue mesurado y ponderado. Por último, determinó que la imposición del in- *488 terés legal desde la interposición de la demanda procedía porque el Tribunal de Primera Instancia tiene la discreción de imponerlos si estima que una parte fue temeraria.
De dicha determinación adversa acude ante nos el señor Ramón Marrero Rosado mediante recurso de certiorari y esgrime, en esencia, los mismos argumentos que esbozó ante el Tribunal de Apelaciones. Examinado el recurso, acordamos expedir. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.(1)
II
La sociedad civil se define en nuestro Código Civil como una institución que surge del contrato celebrado por dos o más personas para poner en común dinero, bienes o industria con el ánimo de repartirse los frutos obtenidos. Art. 1556 del Código Civil, 31 L.P.R.A. see. 4311. El concepto sociedad está fundamentado en tres elementos: la pluralidad de sujetos que generan una personalidad jurídica distinta e independiente de los que la forman, la existencia de un patrimonio común y la finalidad lucrativa. J.A. Cuevas Segarra y A. Román García, Los contratos especiales (Puerto Rico y España), San Juan, Pubs. J.T.S., 1998, pág. 206. Al nacer a raíz del perfeccionamiento de un contrato, la sociedad civil es producto de la convención y en ella se manifiesta el llamado affectio societatis o unión de varias personas hacia un mismo fin de lucro. Marcial v. Tomé, 144 D.P.R. 522 (1997). El contrato que da lugar a la sociedad puede celebrarse por escrito o verbalmente, ex-cepto que será necesario otorgar una escritura pública si se aportan bienes inmuebles. Art. 436 del Código Civil, 31 *489 L.P.R.A. sec. 1558. Además, las sociedades civiles pueden revestir diversas formas, dependiendo de lo pactado por los socios. Arts. 1561 y 1569 del Código Civil, 31 L.P.R.A. sees. 4316 y 4324.
Por otro lado, a menos que no se haya convenido otro momento para el inicio de la sociedad, éste coincide con el instante en que se perfecciona el contrato entre los socios. Art. 1570 del Código Civil, 31 L.P.R.A. see. 4341. Así, pues, la sociedad puede durar: (1) por el periodo pactado; (2) por el periodo que dure el negocio que haya constituido el único objeto de ésta, si por su naturaleza lo tiene, y (3) salvo contadas excepciones, durante la vida de los socios. Art. 1571 del Código Civil, 31 L.P.R.A. see. 4342.
Por su parte, el Art. 1591 del Código Civil establece que la sociedad se extingue: (1) cuando expira el término pactado; (2) cuando se pierde la cosa que le sirve de objeto; (3) cuando finaliza el negocio que le sirve de objeto; (4) cuando muere un socio; (5) cuando un socio adviene insolvente; (6) cuando el acreedor de un socio embarga su participación en la sociedad; (7) cuando un socio anuncia de buena fe y oportunamente su voluntad de que así sea si no se fijó un término para la duración de la sociedad y éste no resulta de la naturaleza del negocio, y (8) cuando el socio de una sociedad constituida a un término fijo, mediante contrato o por su naturaleza, tiene, a juicio de los tribunales, justa causa para pedir la disolución. Arts. 1591, 1596 y 1598 del Código Civil, 31 L.P.R.A. secs. 4391, 4396 y 4398.
A su vez, la disolución de una sociedad por extinción produce su muerte jurídica. Paz Vda. de Barletta v. Registrador, 43 D.P.R. 870, 872 (1932). Una vez ello ocurre, comienza un periodo transicional durante el cual se liquidan los negocios. La liquidación consiste en aquellas operaciones dirigidas a consumar los contratos pendientes a través de las operaciones de pago de deudas y cobro de *490 acreencias para determinar el haber social partible. J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed., Barcelona, Ed. Bosch, 1982, T. II, Vol. II, págs. 519-520. El Código Civil dispone, además, que la partición entre los socios se debe llevar a cabo de acuerdo con las normas que rigen la partición de los caudales hereditarios, tanto en su forma como por las obligaciones que generan, aunque ello no excluye los acuerdos que los socios estimen convenientes. Art. 1599 del Código Civil, 31 L.P.R.A. sec. 4399; Cuevas Segarra y Román García, op. cit., pág. 223.
Considerados los preceptos aplicables a la sociedad civil, examinemos la normativa que rige los procedimientos de quiebra.
III
Los procedimientos de quiebra los regula exclusivamente el Congreso de Estados Unidos de acuerdo con el Artículo 1, Sección 8 de la Constitución de Estados Unidos, L.P.R.A., Tomo 1. Este artículo establece que el Congreso tiene la facultad “[p]ara establecer ... leyes uniformes de quiebras para toda la Nación”. Const. EE. UU., L.P.R.A., Tomo 1, ed. 2008, pág. 167. De acuerdo con el citado texto, la legislación de quiebras federal constituye campo ocupado para los estados, por lo que éstos no pueden legislar en contravención a lo allí dispuesto. En específico, los procedimientos ante las Cortes de Quiebras federales —tribunales creados exclusivamente para llevarlos— se rigen por el Código de Quiebras.(2) 11 U.S.C.A. sec. 101 et seq.
La paralización automática es una de las protecciones más básicas que el legislador estadounidense instituyó en el Código de Quiebras para los deudores que se acogen a éste. Soares v. Brockton Credit Union, 107 F.3d *491 969, 975 (1er Cir. 1997). Ésta impide, entre otras cosas, el comienzo o la continuación de cualquier proceso judicial, administrativo o de otra índole que fue o pudo haber sido interpuesto en contra del deudor, o para ejercitar cualquier acción cuyo derecho nació antes de que se iniciara la quiebra. 11 U.S.C.A. sec. 362. Puede también impedir la ejecución de una sentencia previa o detener la creación, perfección o ejecución de un gravamen anterior a la inter-posición de la quiebra. Id. Sus efectos se manifiestan desde que se presenta la petición de quiebra hasta que recae la sentencia final y no se requiere una notificación formal para que surta efecto. Jamo v. Katahdin Fed. Credit Union, 283 F.3d 392, 398 (1er Cir. 2002). Provoca también que los tribunales estatales queden privados de jurisdic-ción automáticamente, e, incluso, es tan abarcadora que paraliza litigios que tienen poco o nada que ver con la si-tuación financiera del deudor.(3) 3 Collier on Bankruptcy Sec. 362.03 [3] (2009).
Las Cortes de Quiebra tienen amplia discreción para terminar, anular, modificar o condicionar, a solicitud de parte o motu proprio, los efectos de la paralización automática por alguna de las causas enumeradas en el Código de Quiebras. 11 U.S.C.A. sec. 362. Dicha discreción debe ejercerse siempre de acuerdo con las circunstancias del caso particular. Collier, supra, Vol. 3, Sec. 362.07[1]. Así, por ejemplo, una Corte de Quiebras puede poner fin a la paralización automática para permitir que un litigio continúe en otro foro, particularmente si involucra multiplicidad de partes, si está listo para juicio, o si es lo más prudente en atención al aspecto de economía judicial. Collier, supra, Vol. 3, Sec. 362.07[3][a]. También puede ha- *492 cerlo si considera que otro foro es el más apropiado para dilucidar una controversia particular. Id.
Asimismo, una Corte de Quiebras puede modificar una paralización automática para permitir que ciertos aspectos de una controversia se diluciden en otro foro y, a la vez, retener jurisdicción sobre otros aspectos de la controversia. Por ejemplo, una Corte de Quiebras puede modificar la paralización automática para que algún ángulo de una controversia se dilucide en un foro estatal y, a la misma vez, disponer que retiene jurisdicción sobre la forma en que el vencedor podrá dirigirse en contra del deudor para ejecutar su sentencia. Véase John’s Insulation v. L. Addison & Assocs., 156 F.3d 101, 110 (1er Cir. 1998).
Entre los diversos procedimientos establecidos en el Código de Quiebras que dan lugar a la paralización automática se encuentra la llamada “reorganización”, regulada en el Capítulo 11 de dicho cuerpo de ley. La reorganización se caracteriza por ser un procedimiento en el que los peticionarios buscan voluntariamente la protección de la Corte de Quiebras mientras reestructuran sus operaciones de negocios. El objetivo principal del Capítulo 11 es permitir que un deudor que esté enfrentando dificultades para cumplir con sus acreedores pueda impedir que éstos tomen acciones adversas en su contra mientras se reorganiza y busca la forma de continuar cumpliendo con ellos. Para que dicho objetivo pueda llevarse a cabo, el Capítulo 11, a diferencia de otros procedimientos establecidos en el Código de Quiebras, permite que el peticionario se mantenga en control de sus bienes.(4) 11 U.S.C.A. sec. 1107.
Una vez se interpone la petición de quiebra, los acreedores del deudor deben someter sus reclamaciones (proof of claim), según dispone la Sección 501 del Código de *493 Quiebras, 11 U.S.C.A. sec. 501.(5) La definición de reclama-ción (claim) que ofrece el Código de Quiebras es amplia y puede incluir todo tipo de acreencias, incluso aquellas que puedan ser inciertas y difíciles de estimar. Colonial Sur. Co. v. Weizman, 564 F.3d 526, 529 (1er Cir. 2009). En espe-cífico, el Código de Quiebras dispone lo que es una recla-mación:
[a] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured .... 11 U.S.C.A. sec. 101(5).
Mediante una reclamación, una persona que tenga un crédito en contra del deudor se somete a la jurisdicción de la Corte de Quiebras y busca establecer su acreencia. Ello cumple con un propósito dual, a saber, que todos los inte-resados se enteren de las reclamaciones en contra del deu-dor y que el acreedor en cuestión participe de la eventual distribución. Collier, supra, Vol. 4, Sec. 501.0[1].
Sin embargo, el Capítulo 11 dispone que en los casos de reorganización se considera que se ha sometido una reclamación si la deuda en cuestión fue incluida por el deudor en su lista de deudas (schedules). 11 U.S.C.A. sec. 1111. La referida excepción no aplica cuando se trata de deudas descritas como ilíquidas, contingentes o en disputa. 11 U.S.C.A. sec. 1111(a). Es decir, aquellos acreedores que tengan reclamaciones ilíquidas, contingentes o en disputa deben someter una reclamación para que sus intereses queden debidamente protegidos. Collier, supra, Vol. 4, Sec. 501.01[2] [b].
Las distintas reclamaciones que pueden existir en contra de un deudor pueden ser clasificadas en tres grandes grupos: aseguradas, no aseguradas y prioritarias. *494 H.M. Lebowitz, Bankruptcy Deskbook, Nueva York, Practicing Law Institute, 1986, pág. 16. Entre las reclamaciones no aseguradas, es decir, aquellas que, contrario a las ase-guradas, no están respaldadas por un gravamen previo, se encuentran las contingentes. Como sugiere su nombre, una reclamación contingente es aquella cuya procedencia de-pende de un evento que no ha ocurrido al momento de co-menzar la quiebra. Las reclamaciones ilíquidas, por su parte, son aquellas cuya cuantía no se puede determinar aún. El hecho de que la reclamación sea contingente o ilí-quida no impide que ésta se considere como una reclama-ción sujeta a lo que, por último, disponga la Corte de Quiebras. Collier, supra, Vol. 2, Sec. 101.05 [1].
De otra parte, la Sección 502(c) del Código de Quiebras establece que aquellas reclamaciones que sean contingentes o ilíquidas deben ser estimadas, cuando liqui-darlas o fijarlas retrasaría indebidamente la conclusión del procedimiento de quiebra, en detrimento de los demás acreedores o del propio deudor. 11 U.S.C.A. sec. 502(c). En esos casos, la referida disposición es compulsoria y la corte tiene el deber de realizar la estimación. Collier, supra, Vol. 4, Sec. 502.04[2]. En el caso de las quiebras según el Capí-tulo 11, la estimación de las reclamaciones contingentes o ilíquidas se realiza en el plan de reorganización de forma tal que se preserve cierta cantidad para cuando se pueda saber con certeza si la reclamación procede o para cuando sea líquida. La estimación que haga una corte de quiebras para propósitos de un plan de reorganización bajo dicha sección es final y está sujeta a los principios de cosa juz-gada e impedimento colateral por sentencia, siempre que se haya observado el debido proceso de ley. Collier, supra, Vol. 4, Sec. 502.04[3].
Mediante un plan de reorganización de acuerdo con el Capítulo 11, un deudor o un síndico (si fue nombrado) clasifica las reclamaciones en su contra, dispone el tratamiento que cada una recibirá y propone la forma en *495 que el plan será implementado. 11 U.S.C.A. sec. 1123. Luego de que el plan propuesto queda sometido, la Corte de Quiebras celebra una vista y, si se cumplen los requisi-tos dispuestos en el Código de Quiebras, lo confirma me-diante una orden. 11 U.S.C.A. secs. 1128 y 1129. Durante la vista, una parte interesada podrá objetar el contenido del plan y argumentar su oposición de forma que quede documentada. 11 U.S.C.A. sec. 1128.
Una vez la Corte de Quiebras aprueba el plan de reorganización, sus disposiciones se convierten en obligatorias para el deudor y sus acreedores y, salvo ciertas ex-cepciones, ello tiene el efecto de descargar (discharge) todas las reclamaciones que hayan nacido antes del comienzo de la quiebra, excepto por lo que disponga el plan. 11 U.S.C.A. sec. 1141. Ello, aun cuando las deudas no aparezcan en la lista de deudas, cuando el acreedor no haya sometido una reclamación o cuando no reciba nada según el plan. En específico, el Código de Quiebras establece que excepto por lo que se disponga en el plan o en la orden que confirma el plan —luego de que éste se confirma— toda la propiedad sujeta a él estará libre de toda carga o reclamación por parte de los acreedores. íd.
El descargue opera siempre y cuando a los acreedores se les haya provisto el debido proceso de ley que garantiza la Quinta Enmienda de la Constitución de Estados Unidos. Collier, supra, Vol. 8, Sec. 1141.02. Es decir, el plan de reorganización tendrá el efecto de descargar una deuda en particular si se le concedió al acreedor o a parte interesada una oportunidad razonable de ser oído. Como regla general, se cumple con dicho requerimiento mediante la vista previa a la confirmación del plan. Collier, supra, Vol. 8, Sec. 1141.02[4].
La confirmación de un plan de reorganización por parte de la Corte de Quiebras se considera una sentencia de un tribunal federal con efecto de res judicata *496 federal.(6) Stoll v. Gottlieb, 305 U.S. 165 (1938); In re Iannochino, 242 F.3d 36, 41 (ler Cir. 2001). En este sentido, toda objeción al contenido de una orden final de una corte de quiebras debe hacerse antes de ésta advenir final y firme ya que, salvo ciertas excepciones que no aplican al caso ante nos, no está sujeta a ataques colaterales. Travelers Indemnity v. Pearlie Bailey, 129 S.Ct. 2195, 2205 (2009). Así, una parte que participó en un proceso ante la Corte de Quiebras y a quien se le concedió una oportunidad justa de ser oída no puede luego resistir la ejecución de la sentencia de la referida corte. Id., pág. 2206.
Recientemente, en Santiago, González v. Mun. de San Juan, 177 D.RR. 43 (2009), reiteramos que el efecto de cosa juzgada que tiene ante nuestros tribunales una sentencia dictada por un tribunal federal de distrito cuya jurisdicción se basó en una cuestión federal se rige por las normas de res judicata federal. El Tribunal Supremo federal ha resuelto reiteradamente que una sentencia que adviene final y firme constituye res judicata para las partes y sus causahabientes, no sólo en cuanto a todo lo que se alegó y se admitió para sustentar o derrotar una reclamación, sino en cuanto a todo otro asunto que pudo haberse planteado a esos efectos, siempre y cuando se le haya dado a la parte una oportunidad justa de ser oída. Travelers Indemnity v. Pearlie Bailey, supra, pág. 2205. Esta doctrina encuentra sus fundamentos en el interés de proteger a las partes del costo y dificultad que implica tener que lidiar con múltiples litigios, y los objetivos de conservar los recursos judiciales y fomentar la confianza en los procesos judiciales al minimizar la posibilidad de decisiones inconsistentes. Taylor v. Sturgell, 128 S. Ct. 2161, 2171 (2008), citando a Montana v. United States, 440 U.S. 147 (1979).
*497 La doctrina federal res judicata tiene dos vertientes. La primera, conocida como cosa juzgada o claim, preclusion, impide que se relitiguen causas de acción, independientemente de que el primer y el segundo pleito se basen en leyes distintas. Taylor v. Sturgell, supra, citando a New Hampshire v. Maine, 532 U.S. 742, 748 (2001). Ésta requiere que entre un pleito anterior y uno posterior haya: (1) identidad de partes; (2) identidad de causas de acción, y (3) una sentencia final que adjudique los méritos de las mismas controversias. Santiago León v. Mun. de San Juan, supra; Coors Brewing Co. v. Mendez-Torres, 562 F.3d 3, 8 (1er Cir. 2009).
La otra vertiente de la doctrina federal res judicata se conoce como issue preclusion o impedimento colateral por sentencia. Ésta impide que en un pleito posterior se reliti-guen cuestiones de hecho o derecho necesarias para la ad-judicación de un pleito anterior, independientemente de que haya sido por la misma causa de acción o por otra distinta, siempre que sea entre las mismas partes o sus causahabientes. Taylor v. Sturgell, supra. Para que aplique la doctrina de impedimento colateral por sentencia es ne-cesario que: (1) el asunto de hecho o derecho sea el mismo en ambos pleitos; (2) se haya litigado en un pleito anterior; (3) se haya determinado mediante una sentencia final, y (4) la determinación haya sido esencial para el fallo. Coors Brewing Co. v. Mendez-Torres, supra.
Con estos preceptos en mente, pasemos a disponer con-cretamente de la controversia ante nuestra consideración.
IV
A. Según quedó establecido ante el Tribunal de Pri-mera Instancia, la sociedad “La Ceibeña”, creada en 1981 por los hermanos Reyes, Ramón, Rafael y Daniel Marrero Rosado, se disolvió el mismo día en que expiró el contrato de arrendamiento del local donde ubicaba la panadería “La *498 Nueva Ceibeña”, es decir, el 31 de marzo de 1998. El refe-rido foro determinó que en dicha fecha, y por acuerdo de los socios, el propósito social culminó, lo que constituye una causa de extinción de la sociedad según lo dispone el Artí-culo 1591 del Código Civil, supra.
Conforme a las normas expuestas anteriormente, en ese momento comenzó el proceso de liquidación en el que se suponía que la sociedad pagara sus deudas y cobrara sus créditos de forma que culminara sus negocios pendientes. Puig Brutau, op. cit. Una vez ello ocurriera, los socios se partirían el haber social restante de acuerdo con las nor-mas relativas a las herencias o según lo consideraran conveniente. Art. 1599 del Código Civil, supra; Cuevas Se-garra y Román García, op. cit. No obstante, antes de que ese proceso pudiera desarrollarse, los socios (hermanos) Reyes e Ismael Marrero Rosado interpusieron una de-manda ante el Tribunal de Primera Instancia contra el se-ñor Ramón Marrero Rosado y reclamaron la liquidación y partición del haber social. Mientras dicho pleito estaba pendiente ante el foro de instancia, el Sr. Ramón Marrero Rosado sometió una petición de quiebra al amparo del Ca-pítulo 11 del Código de Quiebras. Ello activó inmediata-mente la paralización automática y detuvo el procedi-miento ante el foro local. 11 U.S.C.A. sec. 362. En ese momento el referido foro perdió jurisdicción sobre el pleito y éste quedó suspendido.
Tras varios incidentes procesales y dentro de una acción (adversary proceeding) interpuesta por el Sr. Ramón Ma-rrero Rosado contra los señores Reyes e Ismael Marrero Rosado, la Corte de Quiebras modificó la paralización automática. Ello, por el poder que le confiere el Código de Quiebras para anular, modificar, condicionar o poner fin a una paralización automática. 11. U.S.C.A. sec. 362. De una lectura cuidadosa e integral de la orden que emitió la Corte de Quiebras, se colige que el referido foro consideró que no podría disponer de la acción interpuesta por el Sr. Ramón *499 Marrero Rosado hasta tanto se determinara si la sociedad había sido disuelta conforme al Código Civil. Estimó, ade-más, que el tribunal estatal sería el foro más adecuado para dilucidar la controversia de si la sociedad se había disuelto y, en atención al principio de economía procesal, entendió que modificar la paralización automática era lo más recomendable. Por ello, la corte dispuso en su orden:
... the Court finds that the Bayamón Court is in a better position to resolve the matter. (Énfasis suplido.) Apéndice, pág. 44.
Es decir, lo que hizo el foro de quiebras fue modificar la paralización automática para que las partes litigaran en el tribunal estatal un solo aspecto de la controversia: si la sociedad se había disuelto conforme al Código Civil.
Se podría argumentar, como en efecto lo hacen los seño-res Reyes e Ismael Marrero Rosado, que la Corte de Quie-bras puso fin a la paralización automática. La base de su argumento es una oración de la orden en cuestión que dis-pone:
The Court will lift the automatic stay and allow the defendants to proceed with the state court action. Apéndice, pág. 44.
Es precisamente en esta oración en la que se basó el Tribunal de Apelaciones en la sentencia recurrida para concluir que el foro federal había renunciado a su jurisdic-ción sobre la totalidad de la controversia. No obstante, con-sideramos que la orden debe ser leída e interpretada de forma global para que se pueda conocer completamente lo que la Corte de Quiebras dispuso. En efecto, una lectura completa de la orden deja claro que la corte sólo modificó la paralización automática y no le puso fin.
Prueba adicional de ello es que la Corte de Quiebras también dispuso claramente en su determinación que mantendría la resolución de las demás mociones ante su consideración en suspenso (abeyance) hasta tanto el asunto de la disolución de la sociedad se resolviera en la corte *500 estatal. Es decir, el foro federal dispuso que retendría ju-risdicción sobre los aspectos de la controversia contenidos en las distintas mociones que aún estaban pendientes ante sí. De haber puesto fin a la paralización automática y, como consecuencia, de haber renunciado a toda jurisdicción so-bre la controversia, la Corte de Quiebras tampoco hubiera pospuesto la resolución de las referidas mociones ante su consideración, sino que las hubiera archivado (terminated) y hubiera ordenado el cierre de la acción interpuesta en contra de los señores Reyes e Ismael Marrero Rosado.
Además de disponer que retendría jurisdicción sobre dichas mociones, el foro de quiebras incluyó en el plan de reorganización una cláusula relacionada con la reclama-ción de los señores Reyes e Ismael Marrero Rosado. En la referida cláusula, la Corte de Quiebras clasificó el crédito de éstos como contingente, en disputa, no asegurado e ilíquido. Es decir, el mismo se clasificó como un crédito cuya procedencia dependía de un hecho que aún no se ha-bía producido, cuya existencia era motivo de disputa entre los socios, que no estaba respaldado por un gravamen y cuyo monto se desconocía.
De acuerdo con la normativa del Código de Quiebras, un crédito de esa índole puede ser estimado —para propósitos de un plan de reorganización— cuando esperar a que ocu-rra la contingencia o cuando fijar su cuantía exacta retra-saría indebidamente el proceso de quiebras, en detrimento de los intereses del deudor y de los demás acreedores. 11 U.S.C.A. sec. 502(c). En el caso de autos, así lo hizo la Corte de Quiebras al estimar las partidas que en su día corresponderían a los señores Reyes e Ismael Marrero Ro-sado si el foro estatal decidía que, en efecto, se disolvió la sociedad. El resultado de dicha estimación quedó plasmado en la cláusula del plan de reorganización que dispone que dicha partida asciende a $30,000. De nuevo, de haber re-nunciado por completo a adjudicar aspecto alguno de la controversia relacionada con la sociedad, la Corte de Quie- *501 bras no hubiera incluido la referida partida en el plan de reorganización, ya que no hubiera sido necesario pasar jui-cio sobre el asunto.
Según el marco fáctico que presenta el caso de autos, es forzoso concluir que la Corte de Quiebras modificó la para-lización automática para permitir que se determinara en el foro estatal si la sociedad persistía y, a su vez, retuvo ju-risdicción para establecer la cantidad que se adjudicaría a los señores Reyes e Ismael Marrero Rosado en el plan de reorganización por si el foro estatal encontraba que la so-ciedad había sido disuelta conforme al Código Civil.
Resuelto el asunto sobre la jurisdicción que ejercieron los foros estatales y federales sobre la controversia entre los socios, pasemos a resolver el efecto que tiene el plan de reorganización sobre el caso ante nuestra consideración.
B. La Corte de Quiebras aprobó el plan de reorganiza-ción mediante orden en abril de 2001 y éste advino final y firme en mayo del mismo año, por lo que sus cláusulas se tornaron obligatorias para el señor Ramón Marrero Ro-sado y para sus acreedores, incluso para los señores Reyes e Ismael Marrero Rosado. 11 U.S.C.A. sec. 1141; Collier, supra, Vol. 8, Sec. 1141.02[4]. Es significativo que los seño-res Reyes e Ismael Marrero Rosado no sometieron sus re-clamaciones ante la Corte de Quiebras previo a la aproba-ción del plan de reorganización, a pesar de que, conforme al Capítulo 11, cuando se trate de deudas contingentes, en disputa o ilíquidas, como las que tenían los señores Reyes e Ismael Marrero Rosado, los acreedores deben someter una reclamación para proteger sus intereses. Más significativo aún es el hecho de que la Corte de Quiebras aprobó el plan de reorganización sin oposición de los señores Reyes e Ismael Marrero Rosado, a pesar de que éstos tenían derecho a oponerse y a comparecer en las distintas etapas del pro-cedimiento, incluso a la vista de confirmación del plan. 11 U.S.C.A. sec. 1128. Como expresáramos anteriormente, esta vista es la oportunidad que tienen las personas con *502 interés en el procedimiento, como lo eran los señores Reyes e Ismael Marrero Rosado, para hacer valer su derecho al debido proceso de ley al exponer y dejar constancia ante la Corte de Quiebras de sus objeciones al plan de reorganización. Collier, supra, Vol. 8, Sec. 1141.02[4].
Según el derecho federal, una orden final de una Corte de Quiebras que confirma un plan de reorganización se considera como una sentencia de un tribunal federal con efecto de res judicata. Stoll v. Gottlieb, supra; In re Iannochino, supra. Según expresamos en Santiago León v. Mun. de San Juan, supra, cuando un tribunal federal cuya jurisdicción se basó en una cuestión federal dicta una sentencia, ésta tendrá ante nuestros tribunales el efecto de cosa juzgada que se le reconozca bajo el derecho federal. Por ende, respecto a la controversia ante nuestra consideración, para determinar si la orden que confirmó el plan de reorganización tiene efecto de res judicata —como arguye el Sr. Ramón Marrero Rosado— es necesario evaluar si entre ambos procedimientos existe cosa juzgada (claim preclusion) o impedimento colateral por sentencia (issue preclusion). Consideramos que se trata de impedimento co-lateral por sentencia.
En este caso, ambos pleitos fueron entre las mismas partes debido a que dentro del proceso anterior de quiebra el Sr. Ramón Marrero Rosado, el aquí demandado, instó una acción (adversary proceeding) contra los señores Reyes e Ismael Marrero Rosado, los aquí demandantes. Estos úl-timos comparecieron, alegaron y fueron notificados de to-das las etapas del procedimiento de confirmación del plan de reorganización, por lo que fueron partes en los procedi-mientos ante la Corte de Quiebras, a pesar de no haber presentado sus reclamaciones o haber opuesto objeción a la confirmación del plan.
De otra parte, con relación al requisito de que el asunto de hecho o derecho sea el mismo en ambos pleitos, enten-demos que éste se cumple, dado que la disputa entre las *503 partes en ambos foros fue en cuanto a la cuantía que les corresponde a los señores Reyes e Ismael Marrero Rosado. Como explicáramos anteriormente, la Corte de Quiebras modificó la paralización automática para permitir que las partes litigaran ante nuestros tribunales la cuestión rela-tiva a la disolución de la sociedad, pero retuvo jurisdicción para determinar la cuantía que el Sr. Ramón Marrero Ro-sado debía pagar una vez el foro estatal resolviera el asunto. Es precisamente respecto a este aspecto de la con-troversia, la cuantía, sobre la cual existe identidad entre ambos pleitos, ya que el Tribunal de Primera Instancia también pasó juicio sobre ello. Además, las partes, en es-pecífico los señores Reyes e Ismael Marrero Rosado, según indicamos anteriormente, también tuvieron una oportuni-dad justa de litigar y ser oídos sobre este aspecto en ambos pleitos.
Asimismo, el requisito de que el asunto se haya deter-minado mediante una sentencia final también se satisface, ya que existe una sentencia final que adjudicó la cuestión relativa a la cuantía adeudada por el Sr. Ramón Marrero Rosado. La orden del foro de quiebras que aprobó el plan de reorganización es una sentencia final y firme desde mayo de 2001. En ella la Corte de Quiebras estableció de forma clara la cuantía que estaría disponible para los se-ñores Reyes e Ismael Marrero Rosado una vez el foro esta-tal decidiera. Por último, la determinación de la cuestión fue esencial para el fallo, ya que la partida adjudicada en el plan de reorganización para la eventual liquidación de la sociedad fue, junto a las demás partidas, esencial para re-organizar el caudal en quiebra y poner fin al procedi-miento.
En resumen, al Sr. Ramón Marrero Rosado le asiste la razón en cuanto a su señalamiento de error de que la cuan-tía dispuesta en el plan de reorganización constituye impe-dimento colateral por sentencia. La orden de la Corte de Quiebras en la que se aprobó el plan de reorganización es *504 una sentencia de un foro federal basada en una cuestión de derecho federal que advino final y firme, por lo que debe-mos reconocerle el efecto de res judicata que le otorgaría un tribunal federal. Al estar presentes los requisitos de dicha doctrina federal, nuestros tribunales tienen el deber de reconocer sus efectos. La sentencia del foro de quiebras constituye impedimento colateral por sentencia en cuanto a la cuantía que el Sr. Ramón Marrero Rosado adeuda a los señores Reyes e Ismael Marrero Rosado por la liquidación de la extinta sociedad “La Ceibeña”. Según el plan de reor-ganización, dicha cantidad asciende a $30,000. Resolve-mos, por otra parte, que el Sr. Ramón Marrero Rosado debe satisfacer esa cantidad a sus antiguos socios en la misma proporción de las cuantías dispuestas en la sentencia del Tribunal de Primera Instancia para los señores Reyes e Ismael Marrero Rosado, respectivamente. Es decir, $21,000 al Sr. Ramón Marrero Rosado y $9,000 al Sr. Ismael Marrero Rosado.
V
Nos resta atender el señalamiento del Sr. Ramón Ma-rrero Rosado de que no procede el pago del interés legal por temeridad impuesto en su contra.
Como es sabido, el inciso (b) de la Regla 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, regula el interés legal por temeridad, conocido como “interés pre sentencia”. La temeridad se define como aquella conducta que hace necesario un pleito que se pudo evitar, que lo prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables. Elba A.B.M. v. U.P.R., 125 D.P.R. 294, 329 (1990). Hemos establecido que la temeridad para propósitos de la imposición de este interés es la misma que puede acarrear la condena del pago de honorarios de abogado. Id., citando a Insurance Co. of P.R. v. Tri *505 bunal Superior, 100 D.P.R. 405, 411 (1972). Ambas penali-dades persiguen el mismo propósito de disuadir la litigación frívola y fomentar las transacciones mediante sanciones que compensen a la parte victoriosa por los per-juicios económicos y las molestias producto de la temeridad de la otra parte. Montañez v. U.P.R., 156 D.P.R. 395, 425 (2002).
La imposición del interés legal pre sentencia es altamente discrecional y un foro apelativo sólo intervendrá con la determinación de imponerlo si se demuestra que se cometió un abuso de discreción. Elba A.B.M. v. U.P.R., supra, págs. 328-329. No obstante, este interés sólo se puede imponer en casos de cobro de dinero o de daños y perjuicios. Regla 44.3 de Procedimiento Civil, supra.
En el caso de autos, el señor Ramón Marrero Rosado alega que el Tribunal de Primera Instancia estaba vedado de condenarle al pago del interés legal desde la interposi-ción de la demanda, porque la cantidad máxima que viene obligado a pagar es $30,000 y el plan de reorganización nada dispone sobre el pago de intereses. Arguye, en la al-ternativa, que de proceder el pago de intereses, éstos no pueden comprender el periodo en el que estuvo protegido por la paralización automática.
Es innecesario, sin embargo, dirimir los méritos de las referidas alegaciones, pues el tipo de controversia involu-crada en este caso no se encuentra entre aquellas contem-pladas en las Reglas de Procedimiento Civil como suscep-tibles de la imposición del pago del interés legal por temeridad. Regla 44.3 de Procedimiento Civil, supra. Como señaláramos, este interés sólo se impone en casos de cobro de dinero o de daños y peijuicios. Id. Evidentemente, el caso de autos no es de esa naturaleza, ya que luego de la orden de la Corte de Quiebras que modificó la paralización automática, la controversia se limitó a determinar si la sociedad “La Ceibeña” había sido disuelta. Por ende, revo- *506 camos la determinación del Tribunal de Apelaciones en cuanto confirma la imposición del pago del interés legal por temeridad.
VI
Por los fundamentos antes expuestos, se revoca la sen-tencia recurrida y se devuelve el caso al Tribunal de Pri-mera Instancia para que proceda conforme a lo aquí dispuesto.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Rivera Pérez concurrió con el resultado sin opinión escrita. La Jueza Asociada Señora Fiol Matta disintió sin opinión escrita.

 Al igual que lo hizo ante el Tribunal de Apelaciones, el Sr. Ramón Marrero Rosado arguye que se le violó su derecho al debido proceso de ley al admitirse el informe de la perito a pesar de su oposición. Sin embargo, este señalamiento de error carece de mérito, pues surge del expediente ante nuestra consideración que el peti-cionario tuvo la oportunidad de contrainterrogar a la perito. En este sentido, coinci-dimos con la determinación del Tribunal de Apelaciones sobre este asunto.

 Las Cortes de Quiebra son unidades del Tribunal de Distrito mediante 28 U.S.C. sec. 151, por lo que sus sentencias se consideran sentencias del Tribunal de Distrito Federal correspondiente.

 Aunque somos conscientes de que las Sentencias emitidas por este Tribunal no constituyen precedente, reconocemos que en Morales v. Clínica Femenina de P.R., 135 D.P.R. 810, 819 esc. 5 (1994) (Sentencia), hicimos nuestras las expresiones con-tenidas en La paralización automática de la Ley de Quiebras, Instituto de Estudios Judiciales, 1993, pág. 11, a los efectos de que la mera presentación de una solicitud de quiebra provoca que nuestros tribunales pierdan jurisdicción.

 En ciertas circunstancias, la Corte de Quiebras puede retirar dicho privilegio y otorgar la facultad de administrar el caudal a un síndico. 11 U.S.C.A. sec. 1104.

 Está establecido que según el Código de Quiebras, una reclamación y una deuda son lo mismo. Colonial Sur Co. v. Weizman, 564 F.3d 526, 530 (1er Cir. 2009).

 Según el derecho federal, res judicata es un concepto sombrilla que recoge tanto las vertientes de cosa juzgada (issue preclusion) como de impedimento colateral por sentencia (claim preclusion).